The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| INTEUM COMPANY, LLC,<br><br>         Plaintiff,<br><br>  v.<br><br>NATIONAL UNIVERSITY OF SINGAPORE,<br><br>         Defendant. | NO. 2:17-cv-01252-JCC<br><br>FIRST AMENDED COMPLAINT<br><br>JURY DEMAND |

## I. INTRODUCTION

1.1. This is a story that has been told too many times. Inteum Company developed information management software. The National University of Singapore ("NUS") became a customer. NUS later decided it did not want to pay to license Inteum's software any longer. So NUS went ahead and misappropriated Inteum's proprietary software.

1.2 NUS had been an Inteum customer for 20 years. Without any notice to Inteum, NUS suddenly disrupted that relationship by initiating what was purportedly a full, open competition by publishing a Request for Proposal ("RFP") on the national Singaporean procurement platform ("GeBIZ") designed to select replacement software. NUS concealed that process from Inteum.

1.3 The RFP was a deception and a ruse. Before publication of the RFP, NUS had already been working with Wellspring – an Inteum competitor – to source replacement software.

FIRST AMENDED COMPLAINT (NO. 2:17-cv-01252-JCC) - 1

But NUS did not want to forego any of the features or capabilities of the existing Inteum solution. So, in NUS's RFP statement of work, NUS directed that the contractor's systems should "port over all existing functions available in NUS's existing system." Furthermore, NUS wrote a non-disclosure agreement with Wellspring reciting that NUS intended to share confidential information with Wellspring, including "computer software in source or object code form, computer software documentation and any source material relating to computer software including flowcharts and diagrams."

1.4 Most, if not all, of the computer software and related information to which NUS refers in the above recital is Inteum's proprietary software. Documents obtained from NUS in discovery, moreover, confirm that NUS gave Wellspring a "full backup" copy of Inteum's software. Armed with such a copy, Wellspring obtained unrestricted access to all of the proprietary trade secrets contained in Inteum's software. NUS thus revealed Inteum's confidential trade secrets to Wellspring, and assisted Wellspring in developing replacement software.

1.5 To comply with Singaporean law, a public procurement RFP would need to be published on GeBIZ, and a full, open competition would need to ensue. Despite knowing this, NUS and Wellspring exchanged confidential information outside of and in advance of the procurement process. Wellspring was able to prepare and submit a bid and to demonstrate its own software – called Sophia – to NUS months in advance of the publication of the RFP. Wellspring's later formal bid in response to the RFP was dramatically lower than those of all other bidders – including Inteum.

1.6 By engaging with a selected bidder before the formal public bid opening, NUS breached the rules of its own government's full, open competition public policy. When challenged by Inteum, NUS repeatedly denied any procurement irregularities.

1.7 In taking these actions, NUS breached numerous contractual obligations to Inteum and misappropriated Inteum's trade secrets. Inteum has suffered considerable damage.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

## II. PARTIES

2.1 Inteum is a Limited Liability Company registered with, and formed under the laws of, the State of Washington. Its principal place of business is located in Kirkland, Washington.

2.2 NUS is headquartered in Singapore.

## III. JURISDICTION AND VENUE

3.1 This is an action for breach of contract and trade secret misappropriation. Inteum originally filed this action in King County Superior Court. Pursuant to the relevant contracts, the parties agreed that the transactions at issue occurred in King County, Washington, and further agreed to jurisdiction and venue in King County in the event of any dispute. As such, venue was proper, and the King County Superior Court had personal jurisdiction over NUS. RCW 4.28.180; RCW 4.28.185.

3.2 NUS removed the case to this Court on August 17, 2017. Jurisdiction is proper because the parties are diverse and the amount in controversy exceeds $75,000.

## IV. FACTUAL BACKGROUND

### A. The Founding and Development of Inteum

4.1 Robert Sloman is the founder and CEO of Inteum. He first came to Seattle in 1985, after working for a number of years at Monsanto in Australia. He became President of the Washington Research Foundation ("WRF") in 1987, and remained in that position until founding Inteum in September 1992.

4.2 During his time at WRF, Mr. Sloman began thinking about how a relational database could be designed to support the business of technology transfer. His responsibilities at WRF included auditing and managing its various licensing agreements, contracts and other obligations. He realized that a system needed to be developed to keep track of it all, and began designing a relational database to accomplish that. That work became the foundation for the first iteration of Inteum.

FIRST AMENDED COMPLAINT (NO. 2:17-cv-01252-JCC) - 3

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

4.3     Since its founding in 1992, Inteum has grown, established and maintained itself as a market leader in the development and support of intellectual property management software in the academic marketplace. Inteum's clients include technology transfer offices at hundreds of installations in 25 countries. Over its 25-year history, Inteum has seen many competitors come and go, while Inteum has consistently thrived.

**B.     The Nature, Confidentiality and Economic Value of Inteum's Trade Secrets**

4.4     The core of Inteum's software is a relational database that allows users to organize and manage their intellectual property portfolios in the context of commercial exploitation. To explain it in a very simplified way, a relational database organizes data into tables comprised of columns and rows. Each table generally represents one "entity type," such as customers, patents, agreements or payables. The rows (called records) represent instances of that type of entity, such as the customer's name, patent information or type of details of an expense for example. Each column holds a series of values of the defined data type and each value in each column is referred to as a field, which each make up part of the record (row) to which it belongs. Relationships or linkages can be established among different tables. These relationships enable the software to organize the data efficiently across different tables into reports and also contribute to the algorithms written to search records and sets of records. Reports allow end-users to print out organized representations of their intellectual property portfolios.

4.5     Every relational database has its own unique characteristics. Each database will have its own unique set of tables. The relationships among those tables may be unique. The reports that the database is capable of generating will be unique. The underlying computer source code that generates the tables and the reports will be unique. In the intellectual property management space, all of the major players have unique, proprietary systems that they closely guard as economically valuable trade secrets. In addition to the unique set of tables containing "raw data," Inteum's database program creates secondary tables that contain data for certain

FIRST AMENDED COMPLAINT (NO. 2:17-cv-01252-JCC) - 4

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

purposes, such as security functions and for performance reasons and for other non-trivial functions. In addition, Inteum's database contains functions called triggers, stored procedures, configuration files and SQL code that generates secondary tables and describes how and why these secondary tables exist.

4.6  To protect its trade secrets, Inteum only licenses its software to customers under the strict terms of its License Agreement and related Confidentiality / Non Disclose Agreement ("NDA"). Inteum's License Agreement prohibits licensees from transferring Inteum software "on any basis whatsoever." The License Agreement also prohibits licensees from reverse engineering, decompiling or disassembling Inteum's software. The NDA – which is incorporated into the License Agreement – prohibits licensees from copying or disclosing Inteum's software, or any Inteum trade secrets or other intellectual property, to any third parties. All companies operating in the intellectual property management space have similar contractual arrangements designed to protect their trade secrets. All of them recognize that the characteristics of relational databases described above constitute valuable trade secrets.

4.7  Inteum's NDA and License Agreement provide that how Inteum software functions is a closely-guarded trade secret. What tables Inteum has, and how they relate to one another, are unique to Inteum, are kept secret by Inteum and improve performance of the overall software. NUS was granted the right to use Inteum's software within the bounds of those agreements. NUS was not granted rights to use or to share with third parties the underlying computer source code that generates the various tables which is likewise a closely-guarded trade secret which is not publicly known or available. The types and number of reports that Inteum is capable of generating are also closely-guarded trade secrets. Inteum's trade secrets create performance advantages over its rivals that provide distinct competitive advantages in the marketplace.

4.8  Inteum's Data Dictionary is likewise a closely-guarded trade secret which is not publicly known or available. The Data Dictionary is the database architecture or blueprint,

FIRST AMENDED COMPLAINT (NO. 2:17-cv-01252-JCC) - 5

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

comprised of detailed database structural information. It shows, for instance, how the database is organized into tables, and what relationships exist among the tables.

4.9 If a competitor were to gain access to the Inteum Data Dictionary, it would provide a roadmap for that competitor to construct copycat software, or to copy certain aspects of Inteum. Similarly, if a licensee sought to replace Inteum and migrate its data onto the platform of a competitor, access to the Data Dictionary would be extremely useful. It would allow the person performing the migration to know where to put the individual pieces of data so that the new program would have the same functionality as Inteum. NUS had a duty and contractual obligation to preserve Inteum's trade secrets while migrating its data to Sophia – Wellspring's platform.

4.10 For these – and other – reasons, Inteum does not give its licensees unrestricted access to the Data Dictionary. As a matter of company policy, licensees must seek affirmative permission to access the Data Dictionary, and such access is only granted after the licensee discusses the matter with Inteum personnel and explains the particular need for such access. Typically, such requests involve the desire of licensees to create custom reports, and Inteum generally grants temporary access to the Data Dictionary in those cases. If the licensee indicated that it intended to migrate its data onto the platform of a competitor, access would, of course, be denied unless the licensee could provide assurances that only raw customer data would be disclosed to the third party.

4.11 The printed paper or electronic reports are not themselves considered confidential information. However, reports are created by underlying report definitions that are considered proprietary to Inteum and which software is in the possession of NUS. Such files are themselves closely-guarded trade secrets because they rely on and reveal the structure of underlying tables and software code discussed above. Licensees – such as NUS – can view the underlying tables and portions of Inteum's software when they are reviewing a report within the Inteum database and they do so under the terms of the agreements between the parties. Generally, this trade

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

secret information is of no particular use or interest to Inteum customers, who simply want functional software that organizes and manages their intellectual property portfolio with a user friendly interface. These customers, for instance, may have no appreciation of how Inteum's source code generates secondary tables and reports or why they exist. To a competitor such as Wellspring, however, access to Inteum's tables and source code (closely-guarded trade secrets) would be invaluable. Access to Inteum's trade secrets would permit the competitor to recreate Inteum's performance and functionality within its own system.

4.12 Inteum's Licensing Agreement thus strictly prohibits licensees from sharing Inteum software with any third parties, or providing any third parties access to Inteum. These prohibitions are vitally important in situations where a customer decides to leave Inteum and migrate its data onto a different platform.

4.13 Precisely what data is supplied to the Inteum competitor is critical. If the licensee extracts its raw data from tables that contain the information related to its intellectual property portfolio – and provides only that raw data to the competitor – it has not breached the Licensing Agreement or NDA. If, however, the licensee were to grant the competitor access to the Inteum database, it has breached the Licensing Agreement and the NDA, and improperly exposed Inteum's trade secrets. Similarly, providing the competitor with a complete backup file of Inteum – a "copy" of the Inteum database – would be a breach of the Licensing Agreement and a misappropriation of Inteum trade secrets. With such a "copy" of Inteum, the competitor would have access to all of the proprietary information discussed above, such as the tables and source code. If sent to a third party, Inteum's database file would be persistent, i.e., available and accessible to that third party for as long as that party does not erase the database. Once data migration is performed, the database, unless deleted, will remain at the third party's disposal for whatever purpose that party desires.

4.14 Each year, Inteum earns millions of dollars from existing and new clients who are licensees of Inteum software. New clients pay to license Inteum, and to access other services

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

offered by Inteum. Continuing licensees pay for annual support, training and software upgrades. Inteum spends millions of dollars per year to design and program new features that it adds to its platform. This considerable investment results in continuous improvements in performance, and allows Inteum to maintain its position as market leader. Inteum's software is the result of 25 years of accumulated wisdom and investment. Providing a "copy" of Inteum – or otherwise providing access to Inteum – to a third-party competitor would expose all of the proprietary trade secrets discussed above. At little or no cost to itself, the competitor could examine Inteum's functionality and incorporate Inteum's trade secrets into its own platform. The damages to Inteum in such a scenario would be considerable.

**C. Inteum's Relationship With NUS, and NUS's Termination of That Relationship Through a Sham Tender Process**

4.15 NUS became a licensee of Inteum software in 1996, and it remained a licensee through August 2016. During the course of these 20 years, Inteum and NUS generally enjoyed a harmonious relationship. николаNUS remained a licensee through numerous iterations and upgrades of Inteum, and most recently purchased a license for Inteum Web in 2014. Inteum Web is a cloud-based version of Inteum that is designed to work seamlessly alongside Inteum C/S (which is housed on a licensee's local computer server), and there is no requirement to migrate data between the two platforms.

4.16 Over the course of 2015, NUS and Inteum were working together to deploy Inteum Web on NUS's network infrastructure. During this process, NUS never hinted or suggested that it was planning to replace Inteum with Wellspring's Sophia software. To the contrary, NUS's staff repeatedly and consistently engaged with Inteum to coordinate the implementation of Inteum Web.

4.17 NUS was lying to Inteum. NUS never had any intention of implementing Inteum Web. Since at least June 2015, NUS had been secretly working with Wellspring to replace
FIRST AMENDED COMPLAINT (NO. 2:17-cv-01252-JCC) - 8

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Inteum with Wellspring's Sophia software, and to misappropriate Inteum's trade secrets in the process.

4.18 On January 28, 2016, NUS published the RFP on the national Singaporean procurement platform GeBIZ, seeking software to replace Inteum. NUS never informed Inteum that it sought replacement software, or that it was intending to publish the RFP. Rather – as noted above – NUS led Inteum to believe that it intended to upgrade to Inteum Web, which it had already paid for.

4.19 The RFP was designed to prevent Inteum from even submitting a bid. The tender deadline was 4:00 p.m. Singapore time, February 10, 2016. The tender period, then, was only 14 days, and coincided with Chinese New Year celebrations, a time during which NUS officials charged with responding to questions during the open tender period would be unavailable to answer questions. Preparing a response to an extensive RFP such as this tender in two weeks is nearly impossible. This is something NUS understood. As it turns out, Inteum succeeded in submitting a bid, but only by straining its resources and working around the clock. Even then, Inteum only just barely submitted its bid on time – within an hour of the deadline. Inteum had petitioned for an extension to the tender deadline, but NUS denied that petition.

4.20 Wellspring, on the other hand, managed to submit its detailed bid one full week ahead of the tender deadline. Wellspring only managed this because it had been working together with NUS for many months in advance of the January 28 RFP announcement.

4.21 During this same period, NUS was attempting to surreptitiously access Inteum's servers and access its Data Dictionary. From October 2015 through April 2016, Inteum recorded six separate attempts from someone at NUS to access the Data Dictionary. Because NUS did not contact Inteum before or after these six attempts to access the Data Dictionary, and offered no valid reason as to why it needed access, Inteum rejected these attempts in accordance with company policy. The last attempt by NUS to access Inteum's Data Dictionary occurred on

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

April 7, 2016, well after NUS had already awarded the new contract to Wellspring and was engaged in data migration or data audit exercises.

    4.22    It is critical to understand the timing of these attempts. Just as NUS was beginning its secret conversations with Wellspring – and while it deceived Inteum that it was proceeding with its implementation of Inteum Web – NUS was also seeking access to Inteum's proprietary Data Dictionary. Then on January 30, 2016, two days after publishing the RFP and after Inteum had initiated formal protest proceedings, NUS made additional attempts to access Inteum's Data Dictionary. As discussed above, access to the trade secrets contained in the Data Dictionary would have been very useful to NUS (and Wellspring) as they undertook the process of migrating NUS's data to Wellspring's platform. It would have provided a roadmap for NUS and Wellspring to map the data, while maintaining the functionality of Inteum. That NUS continued its efforts to break into the Data Dictionary after awarding the tender to Wellspring demonstrates that this is precisely what NUS wanted to accomplish.

    4.23    The RFP that NUS published on GeBIZ further underscores NUS's intention to misappropriate Inteum's trade secrets. One of NUS's stated evaluation criteria was that "the new systems should port over all existing functions available in NUS's existing system." In the computer software world, the term "port over" is a term of art that refers to translating software into a version that will operate in a separate environment. In this context, "port over" meant translating the functionality of Inteum into the replacement system. This could only be accomplished by examining Inteum's trade secrets described above – such as its tables, the relationships among those tables, and its source code. In other words, the RFP shows that NUS intended to breach the License Agreement and misappropriate Inteum's trade secrets.

    4.24    NUS's Tender Memorandum and Evaluation Report – which resulted in the award of the contract to Wellspring – reinforces this point. At page 57 of that Tender Memorandum, NUS writes:

FIRST AMENDED COMPLAINT (NO. 2:17-cv-01252-JCC) - 10

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

> We advocate setting aside 10% of budgeted amount of $300,000 for other customizations required that were not contemplated during the requirements phase **since the entire existing functionality of the current system need [sic] to be fully migrated** to the new systems which may entail customizations that were not anticipated during the tender phase. This budget will only be utilized when necessary.

4.25  On March 31, 2016, NUS awarded the contract to Wellspring. The Tender Memorandum further demonstrates that the entire bid process was rigged from the outset to ensure Wellspring won the contract. The Tender Memorandum indicates that the budget limit for the first year of the contract was SG $300,000. Inteum was never told of this budget limit, and this information was not included in the RFP. Perhaps not coincidentally, Wellspring was the only offeror to submit a bid below SG $300,000 in year one of the contract.

4.26  Also, Wellspring's bid – on its face – and only for the first year, was dramatically lower than the competing bids. The Tender Memorandum indicates that Wellspring bid SG $208,400 for the main implementation of Wellspring, over SG $100,000 less than the next nearest bid (Inteum, at SG $312,830). However, Wellspring's "Total Cost of Ownership" over a five-year period was in fact considerably higher than Inteum's bid. The award was given to Wellspring as it was the only respondent to offer a first year bid below the budgeted amount.

4.27  To comply with Singapore law, a public procurement RFP would have to be a full, open competition, or a selective procurement. NUS has repeatedly asserted that it ran a full open competition. As described above, that is not what happened here. NUS and Wellspring exchanged information in advance of the January 28 publication of the RFP on GeBIZ, and were working together to replace Inteum long before the tender was awarded to Wellspring. The RFP was little more than a ruse.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

### D. Materials Produced by NUS Demonstrate That NUS Disclosed Inteum's Trade Secrets to Wellspring

4.28 NUS has only recently begun producing documents in response to Inteum's discovery requests, but the materials produced indicate: (1) that NUS was aware that it was obligated not to disclose Inteum's trade secrets; and (2) that it did so anyway.

4.29 Knowledge Sharing Systems ("KSS") was another Inteum competitor that responded to the January 28 RFP. In a document titled "Tech Questions to KSS," Daniel Leong of NUS posed the following question:

> Could you please elaborate on how the data review is carried out specifically, whether the data will already be extracted into excel or do we provide you the full backup of the tables? Our license with Inteum has confidentiality terms regards [sic] access to the tables which are confidential info of Inteum. How do you handle this for other Inteum migration?

This question to KSS shows that NUS recognized that migrating data from Inteum to another system could involve transferring Inteum's trade secrets. More to the point, NUS raised the possibility of providing "the full backup of the tables." As discussed above, transferring "the full backup" in this way would necessarily involve disclosing Inteum's trade secrets.

4.30 In a document from March 2016, NUS posed this exact same question to Wellspring. Wellspring responded that it would "need the full backup," and that it would then extract the raw data from that backup on its own. In yet another document, dated April 29, 2016, Wellspring states that NUS provided "the back up Inteum database" on April 13, 2016. In other words, Wellspring asked for – and received – a copy of Inteum's software. NUS provided this copy fully aware that this action constituted a breach of its contractual obligations to Inteum.

4.31 Other materials further indicate that NUS shared Inteum's trade secrets with Wellspring. In its response to the RFP, Wellspring stated that it "can commit that field-level configurations and minor customizations to the standard Inteum system are included with Sophia." This statement refers to the database architecture of Inteum, which is comprised of

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

closely-held trade secrets.  Wellspring could not make this commitment unless it had been provided access to Inteum by NUS – whether through "the full backup" of Inteum that NUS provided, or simply by providing Wellspring with remote access to Inteum on NUS's own servers, which access is planned for and declared in the tender.

4.32    Wellspring further commented in its RFP response that it would be able to migrate "all existing documents which are stored on shared drives and are not linked to records on the system [meaning, Inteum] but are tracked by IDs which are captured in current system. Links need to be developed during system migration or documents need to be batch uploaded to the systems to the related IDs."  This could only have been accomplished by providing Wellspring with access to Inteum.

4.33    Yet another document that NUS produced indicates that NUS's personnel assisted Wellspring in reverse engineering aspects of Inteum's functionality.  Specifically, NUS provided Wellspring with screenshots of Inteum and provided written explanations of what certain fields do and how Inteum's tables relate and interact with one another.  The purpose of these explanations was to facilitate Wellspring in creating the same functionality within its Sophia platform.

4.34    Owing to the irregularities in the procurement process – NUS running a sham auction with Wellspring as the preordained winner – Inteum repeatedly sought assurances from NUS that it would honor its contractual obligations to Inteum during the data migration process. Diane Fletcher, NUS's General Counsel, provided such assurances.  The materials produced so far in discovery – which are just the tip of the iceberg – demonstrate that NUS violated its contractual agreements with Inteum and misappropriated its trade secrets.

## V. FIRST CAUSE OF ACTION:  BREACH OF CONTRACT

5.1.    Inteum incorporates paragraphs 1.1 through 4.34 as if fully set forth and alleged herein.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

5.2. NUS breached its contractual obligation of confidentiality contained in the License Agreement and the Confidentiality / Non Disclose Agreement.

5.3 As a direct and proximate result of NUS's breach of contract, Inteum has suffered damages in an amount to be proven at trial.

## VI. SECOND CAUSE OF ACTION: MISAPPROPRIATION OF TRADE SECRETS

6.1. Inteum incorporates paragraphs 1.1 through 5.3 as if fully set forth and alleged herein.

6.2 The information relating to Inteum's software that NUS disclosed to Wellspring included trade secrets owned by Inteum as defined by the Uniform Trade Secrets Act as adopted by the State of Washington (RCW 19.108.010, *et. seq.*).

6.3 NUS's conduct constitutes misappropriation of trade secrets belonging to Inteum in violation of the Uniform Trade Secrets Act.

6.4 As a direct and proximate result of NUS's trade secret misappropriation, Inteum has suffered damages in an amount to be proven at trial.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Inteum prays for relief as follows:

(a) An injunction enjoining NUS from further use and disclosure of Inteum's confidential information or trade secrets;

(b) Damages in an amount to be proven at trial;

(c) Double damages pursuant to the Uniform Trade Secrets Act as adopted by the State of Washington (RCW 19.108.030(2));

(d) An award of attorneys' fees and costs pursuant to the Uniform Trade Secrets Act (RCW 19.108.040);

(e) An award of NUS's unjust enrichment arising from NUS's unlawful behavior;

(f) Pre-judgment interest; and

FIRST AMENDED COMPLAINT (NO. 2:17-cv-01252-JCC) - 14

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

(g) Such other and further relief as the Court deems just and equitable.

## VIII.  JURY DEMAND

Plaintiff demands a trial by jury.

DATED this 5th day of January, 2018.

>BYRNES KELLER CROMWELL LLP
>
>By /s/ Paul R. Taylor  
>    Paul R. Taylor, WSBA #14851  
>By /s/ Nicholas Ryan-Lang  
>    Nicholas Ryan-Lang, WSBA #45826  
>    1000 Second Avenue, 38th Floor  
>    Seattle, WA  98104  
>    Phone:  (206) 622-2000  
>    Fax:  (206) 622-2522  
>    Email:  ptaylor@byrneskeller.com  
>           nryanlang@byrneskeller.com  
>***Attorneys for Plaintiff Inteum Company, LLC***

FIRST AMENDED COMPLAINT (NO. 2:17-cv-01252-JCC) - 15

BYRNES ♦ KELLER ♦ CROMWELL LLP  
38TH FLOOR  
1000 SECOND AVENUE  
SEATTLE, WASHINGTON  98104  
(206) 622-2000

# CERTIFICATE OF SERVICE

The undersigned attorney certifies that on the 5th day of January, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel on record in the matter.

/s/ Paul R. Taylor
Byrnes Keller Cromwell LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
Telephone: (206) 622-2000
Facsimile: (206) 622-2522
ptaylor@byrneskeller.com

FIRST AMENDED COMPLAINT (NO. 2:17-cv-01252-JCC) - 16

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000