The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| INTEUM COMPANY, LLC,<br><br>                              Plaintiff,<br><br>    v.<br><br>NATIONAL UNIVERSITY OF SINGAPORE,<br><br>                             Defendant. | NO. 2:17-cv-01252-JCC<br><br>SECOND AMENDED COMPLAINT<br><br>JURY DEMAND |

## I. INTRODUCTORY STATEMENT

1.1. In moving to dismiss the original complaint, NUS described Inteum's claims as "fact-free conspiratorial musings."[1] NUS apparently believed that the full scope of what occurred would never come to light.

1.2 Documents obtained in discovery establish that everything Inteum alleged, and sadly much more, is true. Here is an example. In its motion for judgment on the pleadings, NUS mocked Inteum's concerns about Inteum's Data Dictionary:

> Likewise, Inteum's continued focus on its Data Dictionary is all very interesting, but . . . . Inteum fails to allege that NUS in fact gained such access.[2]

---
[1] Dkt. 23, NUS' Reply in Supp. of Mot. for J. on the Pleadings at 2.
[2] *Id.*

SECOND AMENDED COMPLAINT (NO. 2:17-cv-01252-JCC) - 1

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

NUS insisted it never obtained the Data Dictionary.[3] We now know that NUS not only obtained the Data Dictionary, but it used it to facilitate the migration from Inteum to Wellspring.[4] Likewise, NUS gave Wellspring a "full backup" of Inteum's software. Inteum's "conspiratorial musings" were spot on.

1.3 Beyond the misappropriation, we now also know that NUS and Wellspring interfered with Inteum's ability to compete in the software procurement run by NUS.

1.4 Internal communications among NUS and Wellspring personnel show their efforts to avoid the requisite open competition. The initial plan was to short circuit the required procurement process and simply hand the contract to Wellspring. When this proved to be unworkable, NUS and Wellspring rigged the bidding process to ensure that Wellspring would win. This involved giving Wellspring the key procurement requirements (some verbatim) in advance of their publication, as well as establishing the amount of Wellspring's bid to ensure it was the low bidder. NUS then dramatically shortened the period for submitting bids, guaranteeing that only Wellspring—with its advance knowledge—could meaningfully participate. Wellspring was also permitted to demonstrate its own software—called Sophia—to NUS months in advance of the publication of the RFP. Not surprisingly, Wellspring won the contract.

1.5 When challenged by Inteum, NUS denied any irregularities. Making matters worse, NUS personnel engaged in a cover up during an internal investigation spawned by Inteum's complaints, lying about what had occurred. Here is just one example. Inteum had complained about the brevity of the tender period. NUS employee Kong Fee, aka Daniel Leong, who led the procurement, told the investigators that no one else had complained. In fact, three of the four bidders had complained that the period was too short to permit a meaningful bid. The

---

[3] Dkt. 16, NUS' Mot. for J. on the Pleadings at 21.
[4] We do not believe that NUS told its counsel about this.

SECOND AMENDED COMPLAINT (NO. 2:17-cv-01252-JCC) - 2

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

only bidder that did not complain—Wellspring—had been given some of the "key requirements" of the tender by Leong months ahead of the tender. (Leong lied about that too.)

1.6 These are just a few examples of what has come to light to date. As detailed below, the facts established that NUS and Wellspring worked together to breach NUS's contractual obligations to Inteum, misappropriate its trade secrets, and interfere with Inteum's prospective economic advantage.

## II. PARTIES

2.1 Inteum is a Limited Liability Company registered with, and formed under the laws of, the State of Washington. Its principal place of business is located in Kirkland, Washington.

2.2 NUS is headquartered in Singapore.

## III. JURISDICTION AND VENUE

3.1 This is an action for breach of contract and trade secret misappropriation. Inteum originally filed this action in King County Superior Court. Pursuant to the relevant contracts, the parties agreed that the transactions at issue occurred in King County, Washington, and further agreed to jurisdiction and venue in King County in the event of any dispute. As such, venue was proper, and the King County Superior Court had personal jurisdiction over NUS. RCW 4.28.180; RCW 4.28.185.

3.2 NUS removed the case to this Court on August 17, 2017. Jurisdiction is proper because the parties are diverse and the amount in controversy exceeds $75,000.

## IV. FACTUAL BACKGROUND

**A. The Founding and Development of Inteum**

4.1 Robert Sloman is the founder and CEO of Inteum. He first came to Seattle in 1985, after working for a number of years at Monsanto in Australia. He became President of the Washington Research Foundation ("WRF") in 1987, and remained in that position until founding Inteum in September 1992.

SECOND AMENDED COMPLAINT (NO. 2:17-cv-01252-JCC) - 3

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

4.2 During his time at WRF, Mr. Sloman began thinking about how a relational database could be designed to support the business of technology transfer. His responsibilities at WRF included auditing and managing its various licensing agreements, contracts and other obligations. He realized that a system needed to be developed to keep track of it all, and began designing a relational database to accomplish that. That work became the foundation for the first iteration of Inteum.

4.3 Since its founding in 1992, Inteum has grown, established and maintained itself as a market leader in the development and support of intellectual property management software in the academic marketplace. Inteum's clients include technology transfer offices at hundreds of installations in 25 countries. Over its 25-year history, Inteum has seen many competitors come and go, while Inteum has consistently thrived.

**B.     The Nature, Confidentiality and Economic Value of Inteum's Trade Secrets**

4.4 The core of Inteum's software is a relational database that allows users to organize and manage their intellectual property portfolios in the context of commercial exploitation. To explain it in a very simplified way, a relational database organizes data into tables comprised of columns and rows. Each table generally represents one "entity type," such as customers, patents, agreements or payables. The rows (called records) represent instances of that type of entity, such as the customer's name, patent information or type of details of an expense for example. Each column holds a series of values of the defined data type and each value in each column is referred to as a field, which each make up part of the record (row) to which it belongs. Relationships or linkages can be established among different tables. These relationships enable the software to organize the data efficiently across different tables into reports and also contribute to the algorithms written to search records and sets of records. Reports allow end-users to print out organized representations of their intellectual property portfolios.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

4.5     Every relational database has its own unique characteristics.  Each database will have its own unique set of tables.  The relationships among those tables may be unique.  The reports that the database is capable of generating will be unique.  The underlying computer source code that generates the tables and the reports will be unique.  In the intellectual property management space, all of the major players have unique, proprietary systems that they closely guard as economically valuable trade secrets.  In addition to the unique set of tables containing "raw data," Inteum's database program creates secondary tables that contain data for certain purposes, such as security functions and for performance reasons and for other non-trivial functions.  In addition, Inteum's database contains functions called triggers, stored procedures, configuration files and SQL code that generates secondary tables and describes how and why these secondary tables exist.

4.6     To protect its trade secrets, Inteum only licenses its software to customers under the strict terms of its License Agreement and related Confidentiality / Non Disclose Agreement ("NDA").  Inteum's License Agreement prohibits licensees from transferring Inteum software "on any basis whatsoever."  The License Agreement also prohibits licensees from reverse engineering, decompiling or disassembling Inteum's software.  The NDA – which is incorporated into the License Agreement – prohibits licensees from copying or disclosing Inteum's software, or any Inteum trade secrets or other intellectual property, to any third parties.  All companies operating in the intellectual property management space have similar contractual arrangements designed to protect their trade secrets.  All of them recognize that the characteristics of relational databases described above constitute valuable trade secrets.

4.7     Inteum's NDA and License Agreement provide that how Inteum software functions is a closely-guarded trade secret.  What tables Inteum has, and how they relate to one another, are unique to Inteum, are kept secret by Inteum and improve performance of the overall software.  NUS was granted the right to use Inteum's software within the bounds of those agreements.  NUS was not granted rights to use or to share with third parties the underlying

computer source code that generates the various tables which is likewise a closely-guarded trade secret which is not publicly known or available. The types and number of reports that Inteum is capable of generating are also closely-guarded trade secrets. Inteum's trade secrets create performance advantages over its rivals that provide distinct competitive advantages in the marketplace.

4.8 Inteum's Data Dictionary is likewise a closely-guarded trade secret which is not publicly known or available. The Data Dictionary is the database architecture or blueprint, comprised of detailed database structural information. It shows, for instance, how the database is organized into tables, and what relationships exist among the tables.

4.9 If a competitor were to gain access to the Inteum Data Dictionary, it would provide a roadmap for that competitor to construct copycat software, or to copy certain aspects of Inteum. Similarly, if a licensee sought to replace Inteum and migrate its data onto the platform of a competitor, access to the Data Dictionary would be extremely useful. It would allow the person performing the migration to know where to put the individual pieces of data so that the new program would have the same functionality as Inteum. NUS had a duty and contractual obligation to preserve Inteum's trade secrets while migrating its data to Sophia – Wellspring's platform.

4.10 For these – and other – reasons, Inteum does not give its licensees unrestricted access to the Data Dictionary. Moreover, on its face, the Data Dictionary places strict limits on its use. It cannot, for example, be used to facilitate a switch to competing software. As a matter of company policy, licensees must seek affirmative permission to access the Data Dictionary, and such access is only granted after the licensee discusses the matter with Inteum personnel and explains the particular need for such access. Typically, such requests involve the desire of licensees to create custom reports, and Inteum generally grants temporary access to the Data Dictionary in those cases. If the licensee indicated that it intended to migrate its data onto the

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

platform of a competitor, access would, of course, be denied unless the licensee could provide assurances that only raw customer data would be disclosed to the third party.

4.11 The printed paper or electronic reports are not themselves considered confidential information. However, reports are created by underlying report definitions that are considered proprietary to Inteum and which software is in the possession of NUS. Such files are themselves closely-guarded trade secrets because they rely on and reveal the structure of underlying tables and software code discussed above. Licensees – such as NUS – can view the underlying tables and portions of Inteum's software when they are reviewing a report within the Inteum database and they do so under the terms of the agreements between the parties. Generally, this trade secret information is of no particular use or interest to Inteum customers, who simply want functional software that organizes and manages their intellectual property portfolio with a user-friendly interface. These customers, for instance, may have no appreciation of how Inteum's source code generates secondary tables and reports or why they exist. To a competitor such as Wellspring, however, access to Inteum's tables and source code (closely-guarded trade secrets) would be invaluable. Access to Inteum's trade secrets would permit the competitor to recreate Inteum's performance and functionality within its own system.

4.12 Inteum's Licensing Agreement thus strictly prohibits licensees from sharing Inteum software with any third parties, or providing any third parties with access to Inteum. These prohibitions are vitally important in situations where a customer decides to leave Inteum and migrate its data onto a different platform.

4.13 Precisely what data is supplied to the Inteum competitor is critical. If the licensee extracts its raw data from tables that contain the information related to its intellectual property portfolio – and provides only that raw data to the competitor – it has not breached the Licensing Agreement or NDA. If, however, the licensee were to grant the competitor access to the Inteum database, it has breached the Licensing Agreement and the NDA, and improperly exposed Inteum's trade secrets. Similarly, providing the competitor with a complete backup file of

SECOND AMENDED COMPLAINT (NO. 2:17-cv-01252-JCC) - 7

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

Inteum – a "copy" of the Inteum database – would be a breach of the Licensing Agreement and a misappropriation of Inteum's trade secrets. With such a "copy" of Inteum, the competitor would have access to all of the proprietary information discussed above, such as the tables and source code. If sent to a third party, Inteum's database file would be persistent, i.e., available and accessible to that third party for as long as that party does not erase the database. Once data migration is performed, the database, unless deleted, will remain at the third party's disposal for whatever purpose that party desires.

4.14    Each year, Inteum earns millions of dollars from existing and new clients who are licensees of Inteum software. New clients pay to license Inteum, and to access other services offered by Inteum. Continuing licensees pay for annual support, training and software upgrades. Inteum spends millions of dollars each year to design and program new features that it adds to its platform. This considerable investment results in continuous improvements in performance, and allows Inteum to maintain its position as market leader. Inteum's software is the result of 25 years of accumulated wisdom and investment. Providing a "copy" of Inteum – or otherwise providing access to Inteum – to a third-party competitor would expose all of the proprietary trade secrets discussed above. At little or no cost to itself, the competitor could examine Inteum's functionality and incorporate Inteum's trade secrets into its own platform. The damage to Inteum in such a scenario would be considerable.

**C.    Inteum's Relationship with NUS, and NUS's Termination of That Relationship Through a Sham Tender Process**

4.15    NUS became a licensee of Inteum software in 1996, and it remained a licensee through August 2016. During the course of these 20 years, Inteum and NUS generally enjoyed a harmonious relationship. NUS remained a licensee through numerous iterations and upgrades of Inteum, and most recently purchased a license for Inteum Web in 2014. Inteum Web is a cloud-based version of Inteum that is designed to work seamlessly alongside Inteum C/S (which is

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

housed on a licensee's local computer server), and there is no requirement to migrate data between the two platforms.

4.16 Over the course of 2015, NUS and Inteum were working together to deploy Inteum Web on NUS's network infrastructure. During this process, NUS never hinted or suggested that it was planning to replace Inteum with Wellspring's Sophia software. To the contrary, NUS's staff repeatedly and consistently engaged with Inteum to coordinate the implementation of Inteum Web.

4.17 NUS was lying to Inteum. NUS never had any intention of implementing Inteum Web. Since at least June 2015, NUS had been secretly working with Wellspring to replace Inteum with Wellspring's Sophia software and to misappropriate Inteum's trade secrets in the process.

4.18 Communications among NUS staff, as well as between NUS and Wellspring, confirm that this was NUS's plan from the outset. Thus in an email dated October 16, 2015, NUS's Kong Fee (the NUS employee tasked with replacing Inteum) emailed Wellspring's CEO, Rob Lowe, stating that he was in charge of the plan to "replace our Inteum IP management system." Fewer than two weeks later – on October 28, 2015 – Fee emailed to Lowe the "key requirements" that NUS wanted in its IP management system. Those "key requirements" would later appear, sometimes verbatim, in the RFP that NUS published on GeBIZ.

4.19 After reviewing those "key requirements," Lowe emailed Fee on October 30, urging him to avoid an open procurement process, and simply award the contract to Wellspring under the theory that Wellspring was the "sole source" of knowledge management systems. Lowe also suggested that if his "sole source" idea would not work, NUS and Wellspring could "structure the pricing" in such a way as to ensure that Wellspring won the contract.

4.20 NUS ultimately determined that the size of the project required it to issue a public tender. But to nevertheless ensure that Wellspring "won," NUS personnel worked closely with Wellspring through November-December 2015 on the technical specifications of the tender. In

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

early December, Wellspring provided a demonstration of its software to NUS personnel. Afterwards, Wellspring's CEO Lowe emailed the Director of NUS's Industry Liaison Office, Sean Flanigan, to tell him that the demonstration had been "successful," and he also answered certain technical questions that NUS had posed related to the transition away from Inteum. Lowe explained that Wellspring would need "a back-up of the Inteum database and related files" to effectuate the transition. As discussed above, providing such a "back-up" would necessarily expose Inteum's trade secrets.

4.21 On January 28, 2016, NUS published the RFP on the national Singaporean procurement platform GeBIZ, seeking software to replace Inteum. NUS never informed Inteum that it sought replacement software, or that it was intending to publish the RFP. In fact, Kong Fee instructed his subordinates to not notify Inteum of the tender. Rather – as noted above – NUS led Inteum to believe that it intended to upgrade to Inteum Web. And, of course, NUS never informed Inteum that it had been working with Wellspring for months to replace Inteum.

4.22 The RFP was designed to prevent Inteum from even submitting a bid. The tender deadline was 4:00 p.m. Singapore time, February 10, 2016. The tender period, then, was only 14 days, and coincided with Chinese New Year celebrations, a time during which NUS officials charged with responding to questions would be unavailable to answer questions. Preparing a response to an extensive RFP such as this tender in two weeks is nearly impossible. This is something NUS understood. As it turns out, Inteum succeeded in submitting a bid, but only by straining its resources and working around the clock. Even then, Inteum only just barely submitted its bid on time – within an hour of the deadline. Inteum had petitioned for an extension to the tender deadline, but NUS denied that petition.

4.23 Internal communications among NUS personnel underscore that NUS made a concerted effort to prevent Inteum from submitting a bid. Just after getting notice of the publication of the RFP, Inteum CEO Robert Sloman sought clarification about why Inteum had received no notice of the coming tender. He emailed Kong Fee, Sean Flanigan and other NUS

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

personnel on January 30, 2016, asking whether Inteum was barred from the process. Fee did not respond. In subsequent correspondence with Inteum employee Ziyan Zhang, Fee claimed that he never received the email, and said that he could not answer questions about the tender because it was not his responsibility.

4.24 These were lies. Fee ran the tender from start to finish. And Fee joked that Mr. Sloman's January 30 email had been marked as "spam" by his "intelligent filter."

4.25 For his part, Flanigan forwarded Mr. Sloman's email (that was supposedly never received) to NUS Enterprise CEO Lily Chan, noting that it appeared Inteum would seek to participate in the tender. Chan responded simply "[h]a ha . . . yes . . ."

4.26 In subsequent communications with NUS personnel, Mr. Sloman raised concerns about the timing of the RFP, and noted that the specifications in the tender appeared to have been taken directly from Wellspring selling documents. Mr. Sloman also noted that the RFP's requirement to "port over" all existing functionality was a clear inducement to a competitor to copy Inteum's proprietary software.

4.27 On February 5, 2016, Eio Hock Liang of the NUS Office of Corporate Compliance ("OCC") emailed Mr. Sloman to inform him that his office would be looking into his concerns regarding the tender. Internally, however, Liang informed his boss – Richard Choong – that he would deliberately avoid speaking with Mr. Sloman until after the tender had closed.

4.28 It was not only Inteum that raised concerns about the short time to respond to the tender. Both Knowledge Sharing Systems and Content Concepts – the only other companies to respond to the RFP – requested extensions to the tender deadline. NUS refused these requests. Notably, in the investigation that followed, Kong Fee lied, telling investigators that only Inteum had complained about the truncated tender period.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

4.29 Wellspring, on the other hand, submitted its detailed bid one full week ahead of the tender deadline. Wellspring only managed this because it had been working together with NUS for many months in advance of the January 28 RFP announcement.

4.30 During this same period, NUS was attempting to surreptitiously access Inteum's servers and access its Data Dictionary. From October 2015 through April 2016, Inteum recorded six separate attempts from someone at NUS to access the Data Dictionary. Because NUS did not contact Inteum before or after these six attempts to access the Data Dictionary, and offered no valid reason as to why it needed access, Inteum rejected these attempts in accordance with company policy. The last attempt by NUS to access Inteum's Data Dictionary occurred on April 7, 2016, well after NUS had already awarded the new contract to Wellspring and was engaged in data migration or/and data audit exercises.

4.31 It is critical to understand the timing of these attempts. In 2015, just as NUS was beginning its secret conversations with Wellspring – and while it deceived Inteum that it was proceeding with its implementation of Inteum Web – NUS was also seeking access to Inteum's proprietary Data Dictionary. Then on January 30, 2016, two days after publishing the RFP and after Inteum had initiated formal protest proceedings, NUS made additional attempts to access Inteum's Data Dictionary. As discussed above, access to the trade secrets contained in the Data Dictionary would have been very useful to NUS (and Wellspring) as they undertook the process of migrating NUS's data to Wellspring's platform. It would have provided a roadmap for NUS and Wellspring to map the data while maintaining the functionality of Inteum. That NUS continued its efforts to break into the Data Dictionary after awarding the tender to Wellspring demonstrates that this is precisely what NUS wanted to accomplish. Of course, NUS ultimately realized it had already obtained the Data Dictionary, and promptly and improperly facilitated the transition to Wellspring's software.

4.32 The RFP that NUS published on GeBIZ further underscores NUS's intention to misappropriate Inteum's trade secrets. As noted above, one of NUS's stated evaluation criteria

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

was that "the new systems should port over all existing functions available in NUS's existing system." In the computer software world, the term "port over" is a term of art that refers to translating software into a version that will operate in a separate environment. In this context, "port over" meant translating the functionality of Inteum into the replacement system. This could only be accomplished by examining Inteum's trade secrets described above – such as its tables, the relationships among those tables, and its source code. In other words, the RFP shows that NUS intended to breach the License Agreement and misappropriate Inteum's trade secrets.

      4.33    NUS's Tender Memorandum and Evaluation Report – which resulted in the award of the contract to Wellspring – reinforces this point. At page 57 of that Tender Memorandum, NUS writes:

> We advocate setting aside 10% of budgeted amount of $300,000 for other customizations required that were not contemplated during the requirements phase **since the entire existing functionality of the current system need [sic] to be fully migrated** to the new systems which may entail customizations that were not anticipated during the tender phase. This budget will only be utilized when necessary.

      4.34    On March 31, 2016, NUS awarded the contract to Wellspring. The Tender Memorandum further demonstrates that the entire bid process was rigged from the outset to ensure Wellspring won the contract. The Tender Memorandum indicates that the budget limit for the first year of the contract was SG $300,000. Inteum was never told of this budget limit, and this information was not included in the RFP. Perhaps not coincidentally, Wellspring was the only bidder to come in below SG $300,000 in year one of the contract.

      4.35    Also, Wellspring's bid – on its face – (but only for the first year) was dramatically lower than the competing bids. The Tender Memorandum indicates that Wellspring bid SG $208,400 for the main implementation of Wellspring, over SG $100,000 less than the next nearest bid (Inteum, at SG $312,830). However, Wellspring's "Total Cost of Ownership" over a five-year period was in fact considerably higher than Inteum's bid. The award was given to Wellspring as it was the only respondent to offer a first year bid below the budgeted amount.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

4.36    To comply with Singapore law, a public procurement RFP would have to be a full, open competition, or a selective procurement. NUS has repeatedly asserted that it ran a full open competition. As described above, that is not what happened here. NUS and Wellspring exchanged information in advance of the January 28 publication of the RFP on GeBIZ and were working together to replace Inteum long before the tender was awarded to Wellspring. The RFP was little more than a ruse.

4.37    Subsequent events underscore this point. Following the close of the tender period on February 10, OCC Director Richard Choong directed his subordinate, Eio Hock Liang, to look into the concerns that Mr. Sloman had previously raised. On February 25, 2016, the OCC completed a report into Mr. Sloman's allegations, which was provided to Singapore's Ministry of Finance. The report specifically identified NUS's Kong Fee as the principal source of information for the report's contents.

4.38    With respect to Inteum's contention that NUS intentionally sought to exclude Inteum as a participant in the tender, the report concluded this was untrue. Based on Kong Fee's assertion that only Inteum had complained about the short tender period, the report concluded that the RFP was open and fair. But this was false. As noted above, all of the participating companies except Wellspring complained about the short tender period and requested extensions.

4.39    Similarly, Kong Fee lied to the OCC about the "port over" language contained in the tender specifications. Kong Fee said the language "was intended to address a data migration issue." On its face, however, the language in question clearly dealt with Inteum's functionality: "It is the intention that the new systems should port over all existing functions available in NUS's existing system." In a recent deposition, NUS's Sean Flanigan conceded that the "Port Over" language did not address any "data migration issue," and that Kong Fee's representation to the contrary was false.

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON  98104
(206) 622-2000

### D. Materials Produced by NUS Demonstrate That NUS Disclosed Inteum's Trade Secrets to Wellspring

4.40  Materials that NUS has produced thus far in discovery indicate: (1) that NUS was aware that it was obligated not to disclose Inteum's trade secrets; and (2) that it did so anyway.

4.41  As discussed above, KSS was another Inteum competitor that responded to the January 28 RFP. In a document titled "Tech Questions to KSS," Kong Fee of NUS posed the following question:

> Could you please elaborate on how the data review is carried out specifically, whether the data will already be extracted into excel or do we provide you the full backup of the tables? Our license with Inteum has confidentiality terms regards [sic] access to the tables which are confidential info of Inteum. How do you handle this for other Inteum migration?

This question to KSS shows that NUS recognized that migrating data from Inteum to another system could involve transferring Inteum's trade secrets. More to the point, NUS raised the possibility of providing "the full backup of the tables." As discussed above, transferring "the full backup" in this way would necessarily involve disclosing Inteum's trade secrets.

4.42  In a document from March 2016, NUS posed this exact same question to Wellspring. Wellspring responded that it would "need the full backup," and that it would then extract the raw data from that backup on its own.

4.43  On April 6, 2016, NUS Database Administrator Qiu Ying emailed a copy of Inteum's entire database architecture to Wellspring's Chief Operating Officer, Matt Hamilton. That list – which extended more than 40 pages – detailed the file names for every single component of Inteum, and would be invaluable to a competitor such as Wellspring attempting to reverse engineer Inteum's software. In providing Hamilton this blueprint of Inteum, Ying asked Hamilton to look through it and tell her what he needed to facilitate the transition to Wellspring.

4.44  Communications among NUS and Wellspring personnel indicate that NUS then provided a full "backup Inteum database" of Inteum to Wellspring on April 13, 2016. In other

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

words, Wellspring asked for – and received – a copy of Inteum's software. NUS provided this copy fully aware that this action constituted a breach of its contractual obligations to Inteum.

4.45 At around this same time, but no later than April 21, 2016, NUS had managed to print, and was using Inteum's proprietary Data Dictionary to facilitate the switchover. (This is the same Data Dictionary that NUS suggested, in motion practice, was the subject of "fact-free conspiratorial musings," and was supposedly never obtained by NUS.) Significantly, on its face, the Data Dictionary clearly states the limits of its use. Using it to facilitate a switch to a competitor's product is not a permitted use.

4.46 Other materials further indicate that NUS shared Inteum's trade secrets with Wellspring. In its response to the RFP, Wellspring stated that it "can commit that field-level configurations and minor customizations to the standard Inteum system are included with Sophia." This statement refers to the database architecture of Inteum, which is comprised of closely-held trade secrets. Wellspring could not make this commitment unless it had been provided access to Inteum by NUS – whether through "the full backup" of Inteum that NUS provided, or simply by providing Wellspring with remote access to Inteum on NUS's own servers, which access is planned for and declared in the tender.

4.47 Wellspring further commented in its RFP response that it would be able to migrate "all existing documents which are stored on shared drives and are not linked to records on the system [meaning, Inteum] but are tracked by IDs which are captured in current system. Links need to be developed during system migration or documents need to be batch uploaded to the systems to the related IDs." This could only have been accomplished by providing Wellspring with access to Inteum.

4.48 Yet another document that NUS produced indicates that NUS's personnel assisted Wellspring in reverse engineering aspects of Inteum's functionality. Specifically, NUS provided Wellspring with screenshots of Inteum and provided written explanations of what certain fields do and how Inteum's tables relate and interact with one another. The purpose of these

SECOND AMENDED COMPLAINT (NO. 2:17-cv-01252-JCC) - 16

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

explanations was to facilitate Wellspring in creating the same functionality within its Sophia platform.

    4.49    Owing to the irregularities in the procurement process – NUS running a sham auction with Wellspring as the preordained winner – Inteum repeatedly sought assurances from NUS that it would honor its contractual obligations to Inteum during the data migration process. Diane Fletcher, NUS's General Counsel, provided such assurances. The materials produced so far in discovery – which are just the tip of the iceberg – demonstrate that NUS violated its contractual agreements with Inteum and misappropriated its trade secrets.

## V. FIRST CAUSE OF ACTION: BREACH OF CONTRACT

    5.1.    Inteum incorporates paragraphs 1.1 through 4.49 as if fully set forth and alleged herein.

    5.2.    NUS breached its contractual obligation of confidentiality contained in the License Agreement, the Confidentiality / Non Disclose Agreement, and the Data Dictionary.

    5.3    As a direct and proximate result of NUS's breach of contract, Inteum has suffered damages in an amount to be proven at trial.

## VI. SECOND CAUSE OF ACTION: MISAPPROPRIATION OF TRADE SECRETS

    6.1.    Inteum incorporates paragraphs 1.1 through 5.3 as if fully set forth and alleged herein.

    6.2    The information relating to Inteum's software that NUS disclosed to Wellspring included trade secrets owned by Inteum as defined by the Uniform Trade Secrets Act as adopted by the State of Washington (RCW 19.108.010, *et. seq.*).

    6.3    NUS's conduct constitutes misappropriation of trade secrets belonging to Inteum in violation of the Uniform Trade Secrets Act.

    6.4    As a direct and proximate result of NUS's trade secret misappropriation, Inteum has suffered damages in an amount to be proven at trial.

Byrnes ♦ Keller ♦ Cromwell llp
38th Floor
1000 Second Avenue
Seattle, Washington 98104
(206) 622-2000

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Inteum prays for relief as follows:

(a) An injunction enjoining NUS from further use and disclosure of Inteum's confidential information or trade secrets;

(b) Damages in an amount to be proven at trial;

(c) Double damages pursuant to the Uniform Trade Secrets Act as adopted by the State of Washington (RCW 19.108.030(2));

(d) An award of attorneys' fees and costs pursuant to the Uniform Trade Secrets Act (RCW 19.108.040);

(e) An award of NUS's unjust enrichment arising from NUS's unlawful behavior;

(f) Pre-judgment interest; and

(g) Such other and further relief as the Court deems just and equitable.

## VIII. JURY DEMAND

Plaintiff demands a trial by jury.

DATED this 29th day of May, 2018.

        BYRNES KELLER CROMWELL LLP

        By /s/ Paul R. Taylor
           Paul R. Taylor, WSBA #14851
        By /s/ Nicholas Ryan-Lang
           Nicholas Ryan-Lang, WSBA #45826
           1000 Second Avenue, 38th Floor
           Seattle, WA 98104
           Phone: (206) 622-2000
           Fax: (206) 622-2522
           Email: ptaylor@byrneskeller.com
                   nryanlang@byrneskeller.com
        ***Attorneys for Plaintiff Inteum Company, LLC***

SECOND AMENDED COMPLAINT (NO. 2:17-cv-01252-JCC) - 18

BYRNES ♦ KELLER ♦ CROMWELL LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000

# **CERTIFICATE OF SERVICE**

    The undersigned attorney certifies that on the 29th day of May, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel on record in the matter.

<u>/s/ Nicholas Ryan-Lang</u>
Byrnes Keller Cromwell LLP
1000 Second Avenue, 38th Floor
Seattle, WA 98104
Telephone: (206) 622-2000
Facsimile: (206) 622-2522
nryanlang@byrneskeller.com

Byrnes ♦ Keller ♦ Cromwell LLP
38TH FLOOR
1000 SECOND AVENUE
SEATTLE, WASHINGTON 98104
(206) 622-2000