UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

INTEUM COMPANY, LLC, a Washington
limited liability company,

                    Plaintiff,

     v.

NATIONAL UNIVERSITY OF SINGAPORE,
a foreign, non-profit entity,

                    Defendant.

CASE NO. C17-1252-JCC

ORDER

This matter comes before the Court on Defendant National University of Singapore's motion for summary judgment (Dkt. No. 45). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS in part and DENIES in part the motion for the reasons explained herein.

## I.     BACKGROUND

Plaintiff is a Washington limited liability company that develops and supports intellectual property management software, commonly referred to as Knowledge Management Software ("KMS"). (Dkt. Nos. 35 at 4, 45 at 7, 63 at 3.) Defendant is headquartered in Singapore, and licensed Plaintiff's KMS from 1996 to August 2016. (Dkt. No. 35 at 8.) At all times relevant to this case, the parties' contractual relationship was governed by an August 2012 License Agreement (the "License Agreement"), a 2015 Software Maintenance Plan ("SMP"), and a non-

disclosure agreement ("NDA"). (Dkt. No. 51-1 at 2–4, 6–8, 10–12.)

The SMP gave a nonexclusive license to Defendant to use Plaintiff's Inteum C/S® software program (the "Inteum Software"). (*Id*. at 7.) The Inteum Software is composed of the software application and a relational database, which is used to store and display a large amount of the client's data. (Dkt. No. 46 at 1, 3.) A relational database stores data in tables that capture different types of information, and is capable of combining information from separate tables. (*Id*. at 2.) Under the terms of the SMP, the parties' contractual relationship expired on August 6, 2016, and Defendant was not obligated to subscribe to another SMP with Plaintiff. (Dkt. No. 51-1 at 7–8, 27–28.)

The License Agreement governed Defendant's use of the Inteum Software. (Dkt. No. 51-1 at 2.) The License Agreement provided that the Inteum Software "is owned by [Plaintiff] . . . and is protected by United States trade secret and copyright laws . . . [,]" and that Defendant could "either (a) make one copy of the [Inteum Software] solely for backup or archival purposes, or (b) transfer the [Inteum Software] to a single hard disk provided that [Defendant] keeps the original solely for backup or archival purposes." (*Id*.) The License Agreement further provided that Defendant "may not transfer the [Inteum Software] on any basis whatsoever. [Defendant] may not reverse engineer, decompile, or disassemble the [Inteum Software]." (*Id*.) The License Agreement was to be read in conjunction with the NDA and SMP. (*Id*. at 3.)

The NDA states that Plaintiff was "the owner of certain proprietary, trade secret and copyrighted information relating to the" Inteum Software. (*Id*. at 10.) The NDA applied to the Inteum C/S® Data Dictionary (the "data dictionary"); data dictionaries are common database reference tools used to identify information stored in a database's tables. (Dkt. No. 46 at 32.) The NDA was intended to ensure that Defendant would maintain the Inteum Software under strict confidentiality, and required that written or graphical presentations, as well as written summaries of oral presentations, of the Inteum Software be marked "confidential." (Dkt. No. 51-1 at 10.) The NDA permitted Defendant to make one copy of the Inteum Software, and required that any

disclosed information carry proprietary and copyright notices. (*Id.*) Under the NDA, Defendant could use the Inteum Software "only to develop management reports and to otherwise enjoy use of the software to the fullest extent of its capabilities." (*Id.* at 11.) The NDA did not apply to output reports of the Inteum Software that did not reveal data structure, which generally means "tables and file names and the relationships between them." (*Id.*; Dkt. No. 64 at 3.)

Beginning in 2015, Defendant began exploring KMS of other vendors, including Wellspring Worldwide, Inc.'s ("Wellspring") "Sophia" product. (Dkt. No. 47 at 3–5.) In January 2016, Defendant posted an invitation to tender on GeBIZ, a Singapore Government website. (*Id.* at 5–6.) Defendant received four bids, including bids from Plaintiff and Wellspring. (*Id.* at 6.) Defendant selected Wellspring as its new KMS provider, and signed license documents with Wellspring in March 2016. (*Id.*)

Defendant and Wellspring worked together to migrate Defendant's data from the locally-hosted Inteum Software's database to Wellspring's Sophia product. (Dkt. No. 48 at 2.) Several events related to the data migration are relevant to this case. Wellspring told Defendant that a backup of the Inteum Software's database and related files were needed for the purpose of data migration, and later communications indicate that Defendant provided the backup to Wellspring in April 2016. (Dkt. No. 62-1 at 32, 11–12.) Also prior to the data migration, Defendant sent Wellspring a list of the database objects contained in Defendant's version of the Inteum Software (the "Filename List"). (Dkt. No. 52 at 24–63.) During the data migration itself, Defendant's employees extracted data from 399 tables in Defendant's version of the Inteum Software's database and exported the data from each into a comma separated value (".csv") file. (Dkt. Nos. 46 at 6, 48 at 3.) These files store data as a plain text file and do not store any code, and therefore cannot be used to restore the Inteum Software's database or launch the Inteum Software. (Dkt. No. 46 at 7–8, 11–12.)

In August 2016, the 399 .csv files were uploaded to a secure file transfer portal hosted by Wellspring for a data audit, at which point the data would be evaluated to determine where it

should be placed in the Sophia database. (Dkt. No. 48 at 4.) After the data audit was completed, Defendant transferred 233 .csv files to Wellspring, representing the final migration of data. (Dkt. No. 48 at 4.) Plaintiff claims that a number of the .csv files sent were of "secondary" tables proprietary to Plaintiff, as they contain "materialized data" produced by applying the Inteum Software's algorithms to Defendant's data to generate customized combinations of data. (Dkt. Nos. 45 at 12, 64 at 4.)[1] Plaintiff has filed suit against Defendant, alleging that Defendant breached its contracts with Plaintiff and that Defendant misappropriated Plaintiff's trade secrets. (Dkt. No. 35 at 17.) Defendant now moves for summary judgment dismissing Plaintiff's claims. (Dkt. No. 45.)

## II.    DISCUSSION

### A.    Motion to Strike Expert Declaration

Plaintiff moves to strike the declaration of Dr. Rajeev Surati pursuant to Federal Rule of Civil Procedure 37(c)(1). (Dkt. No. 63 at 3.) Plaintiff contends that Defendant wrongfully refused to make Dr. Surati available for a deposition because his expert report had not been served. (*Id*.) "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). An expert's report must be disclosed at least 90 days before the trial date. Fed. R. Civ. P. 26(a)(2)(D). If an expert is required to provide a report under Rule 26(a)(2)(B), a deposition of that expert "may be conducted only after the report is provided." Fed. R. Civ. P. 26(b)(4)(A).

Trial in this matter is set to begin on March 18, 2019. (Dkt. No. 28.) Dr. Surati's report had to be disclosed by December 18, 2018. Fed. R. Civ. P. 26(a)(2)(D). Defendant served Plaintiff with Dr. Surati's expert report on December 18, 2018. (Dkt. No. 70 at 2.) Therefore,

---

[1] The precise number of tables at issue is unclear. (*See* Dkt. Nos. 45 at 15; 46 at 6 n.4; Dkt. No. 51-4 at 2–3; 61 at 14; 64 at 3.) As the total number is not relevant to the Court's analysis of the parties' claims, it will not resolve this dispute in the context of this motion.

Defendant timely disclosed Dr. Surati's expert report, and Plaintiff did not have a right to depose Dr. Surati prior to that date. Fed. R. Civ. P. 26(a)(2)(D), (b)(4)(A). Plaintiff's motion to strike Dr. Surati's declaration pursuant to Rule 37(c)(1) is DENIED.

### B.     Washington Uniform Trade Secrets Act ("WUTSA") Preemption

On January 11, 2019, the Court ordered Plaintiff to show cause why its breach of contract claims were not preempted by the WUTSA, as its breach of contract and trade secret misappropriation claims are premised on the same operative facts. (Dkt. No. 76.) Both parties submitted supplemental briefing on this issue. (Dkt. Nos. 80, 82.)

The controlling case on this issue is the Washington Supreme Court's decision in *Boeing Co. v. Sierracin Corp.*, 738 P.2d 665 (Wash. 1987). In *Boeing*, the Washington Supreme Court held that the WUTSA did not displace a party's ability to bring a breach of contract claim independent from a trade secret misappropriation claim. *Id.* at 673–74 (citing Uniform Trade Secrets Act of the National Conference of Commissioners on Uniform State Laws, at 6 (Aug. 3, 1978)). Notwithstanding *Boeing*, the state of the law in Washington became less clear following the Washington Court of Appeals' decision in *Thola v. Henschell*, 164 P.3d 524 (Wash. Ct. App. 2007). In *Thola*, the Washington Court of Appeals stated that a civil claim was preempted by the WUTSA if the facts supporting the claim "are the same as those that support the plaintiff's WUTSA claim." *Id.* at 530. *Thola* did not differentiate between tort- and contract-based civil claims. *See id.* Following *Thola*, courts were divided about whether contract claims premised on the same operative facts as a trade secret misappropriation claim were preempted by the WUTSA. *Compare Cen Com Inc. v. Numerex Corp.*, 2018 WL 1182240, slip op. at 2 (W.D. Wash. 2018) (applying *Thola* to dismiss a breach of contract claim that was "not factually independent from" the plaintiff's WUTSA claim); *with Illinois Tool Works Inc. v. Seattle Safety LLC*, 2008 WL 11343004, slip op. at 4 (W.D. Wash. 2008) (applying *Boeing* to conclude that plaintiffs' breach of confidentiality claim was not preempted by WUTSA).

The Washington Court of Appeals recently clarified this split of authority. *See*

*Modumetal, Inc. v. Xtalic Corp.*, 425 P.3d 871 (Wash. Ct. App. 2018), *rev. denied*, 432 P.3d 793 (Wash. 2019). In *Modumetal*, the Washington Court of Appeals stated that, "Until or unless the Washington Supreme Court overrules <u>Boeing</u> and adopts the <u>Thola</u> analysis, <u>Boeing</u> controls. Accordingly, we follow <u>Boeing</u> and conclude that Modumetal's common law confidentiality claims are not preempted by its trade secrets claims, regardless of whether they are based on the same facts." *Id.* at 882; *see also SEIU Healthcare Nw. Training P'ship v. Evergreen Freedom Found.*, 427 P.3d 688, 695 (Wash. Ct. App. 2018) (quoting *Modumetal* to state that *Boeing*, not *Thola*, controls preemption analysis under WUTSA). Therefore, Plaintiff can support its breach of contract and trade secret misappropriation claims with the same operative facts.

### C.    Summary Judgment Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49. Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### D.    Breach of Contract

Defendant moves for summary judgment on Plaintiff's claims for breach of the License Agreement and the NDA. (Dkt. No. 45 at 15–17.) The elements of a breach of contract claim are

"(1) a contract that imposed a duty, (2) breach of that duty, and (3) an economic loss as a result of the breach." *Myers v. State*, 218 P.3d 241, 243 (Wash. Ct. App. 2009).

### 1. Duties Under the License Agreement and NDA

Under the License Agreement, Defendant was prohibited from transferring, reverse engineering, decompiling, or disassembling the Inteum Software, comprised of the software application and the relational database. (Dkt. Nos. 46 at 3, 51-1 at 2–3.) The NDA applied to Plaintiff's proprietary, trade secret, and copyrighted information related to the Inteum Software, including the data dictionary. (Dkt. No. 51-1 at 10.) Under the NDA, Defendant was only allowed to use this information "expressly and only to develop management reports and to otherwise enjoy use of the software to the fullest extent of its capabilities." (*Id.* at 11.)

### 2. Breaches of the License Agreement and NDA

#### a. Full Database Backup

Defendant moves for summary judgment on Plaintiff's claim that Defendant breached the confidentiality provisions of the License Agreement and NDA by providing Wellspring a full backup of Plaintiff's database. (Dkt. Nos. 45 at 15, 51-4 at 2.) Prior to the data migration, Wellspring told Defendant that it would need "a back-up of the Inteum database and related files." (Dkt. No. 62-1 at 32.) Later communications between Defendant and Wellspring indicate that Defendant provided Wellspring with "the back up Inteum database" on April 13, 2016. (*Id.* at 111–12.) Defendant submits evidence purporting to show that the "backup Inteum database" described in the communications was actually the 399 .csv files, not a full backup database. (*See* Dkt. No. 51-4 at 25–26, 135–36, 152–53, 157–58, 161–168.) Although Defendant asserts that this evidence establishes that there is no genuine dispute as to whether Defendant sent a full backup database to Wellspring, the evidence merely rebuts the documentary evidence supporting Plaintiff's claim that the database was sent from Defendant to Wellspring. (Dkt. No. 45 at 15, 23; *see* Dkt. No. 62-1 at 32, 110, 112.) Therefore, there is a genuine dispute as to whether a full backup of Plaintiff's database was sent by Defendant to Wellspring in violation of the

confidentiality provisions of the License Agreement and NDA. Defendant's motion for summary judgment is DENIED on this ground.[2]

### b. Secondary Tables

Defendant moves for summary judgment on Plaintiff's claim that Defendant breached the terms of the License Agreement and NDA by disclosing Plaintiff's secondary tables to Wellspring. (Dkt. Nos. 45 at 15–16, 51-4 at 2–3, 61 at 14.) The .csv files sent by Defendant to Wellspring only stored data as a plain text file and could not be used to replicate or reverse engineer the Inteum database, Plaintiff's secondary tables, or the Inteum Software. (Dkt. Nos. 46 at 12, 51-4 at 39–40.) Plaintiff has not argued that the transfer of the .csv files constituted a transfer of the Inteum Software, or that Wellspring would have been able to reverse engineer the Inteum Software upon receipt of the .csv files. (*See* Dkt. No. 61 at 14.) Therefore, there is no genuine dispute that Defendant's sending of the .csv files to Wellspring did not breach the terms of the License Agreement.

Even though the .csv files transferred by Defendant to Wellspring did not constitute a transfer of the Inteum Software or enable Wellspring to reverse engineer the Inteum Software, Plaintiff contends that Defendant is still liable for breaching the NDA because "[i]f [the secondary tables] are trade secrets, they could not be shared." (Dkt. No. 61 at 14.) As discussed *infra*, Plaintiff has not carried its burden of establishing that the secondary tables are legally protectable as trade secrets. (*See* Section II.E.1.a.) Therefore, there is no genuine dispute that disclosure of the secondary tables did not constitute a breach of the NDA. Defendant's motion

---

[2] Plaintiff appears to contend that Defendant also breached the License Agreement and NDA by creating a backup database. (Dkt. No. 61 at 8, 14.) But the License Agreement permitted Defendant to make a copy of the Inteum Software for backup or archival purposes; thus, the mere creation of a backup is insufficient to constitute a breach of the License Agreement. (Dkt. No. 51-1 at 2.) Further, Plaintiff has not asserted a theory of damages for this alleged breach; Plaintiff only seeks to recover the value of the lost contract and "the total value of the trade secrets that [Defendant] provided to Wellspring." (Dkt. Nos. 51-4 at 15–16, 61 at 14–16.) Therefore, to the extent Plaintiff claims that the creation of a backup database constituted a breach of the License Agreement and NDA, such claim fails as a matter of law.

for summary judgment is GRANTED on this ground.

### c. Filename List

Defendant moves for summary judgment on Plaintiff's claim for breach of contract premised on Defendant's sending of the Filename List to Wellspring. (Dkt. Nos. 45 at 16, 51-4 at 2.) The Filename List did not enable Wellspring to reverse engineer the Inteum Software or its database, (Dkt. No. 51-4 at 73), and Plaintiff does not contend that the sending of the Filename List constituted a transfer of the Inteum Software. (Dkt. No. 61 at 14.) Therefore, there is no genuine dispute that the transfer of the Filename List did not violate the terms of the License Agreement.

Plaintiff contends that "there is a question of fact about whether the 39-page [Filename List] of everything in the software was a trade secret . . . If it is, its disclosure violated the plain language of the License Agreement." (*Id*.) Notwithstanding that the NDA prohibited disclosure of Plaintiff's trade secrets, as discussed *infra* Plaintiff has not carried its burden of establishing that the Filename List is legally protectable as a trade secret. (*See* Section II.E.1.b.) Therefore, there is no genuine dispute that the disclosure of the Filename List did not constitute a breach of the NDA. Defendant's motion for summary judgment is GRANTED on this ground.

### d. Inteum Front End

Defendant moves for summary judgment on Plaintiff's claim that Defendant breached the confidentiality provisions of the License Agreement and the NDA by "referr[ing] to the Inteum front end (or application) during the data migration process in an effort to port over functionality of the existing Inteum system to the Wellspring system." (Dkt. Nos. 45 at 16, 51-4 at 3.) Defendant argues that Plaintiff's "unspecified references" to the Inteum front end do not constitute transfers or reverse engineering efforts, and that the License Agreement and NDA do not prohibit discussion of program functions that are visible to users and publicly disclosed by Plaintiff. (Dkt. No. 45 at 16) (citing Dkt. Nos. 51-5–51-8). But Plaintiff contends that these discussions constituted efforts to reverse engineer the functionality of the Inteum Software, and

thus violated the License Agreement. (Dkt. No. 61 at 12, 14–16.)[3] Furthermore, evidence in the record indicates that Defendant discussed the Inteum front end with Wellspring in order to "port over," or replicate the functionality of, the Inteum Software. (Dkt. No. 64 at 2, 7; *see also* Dkt. No. 72 at 7) (Dr. Surati noting that the screenshots cited by Plaintiff depict two "raw" data tables that Plaintiff does not claim as proprietary, but stating that the data audit documents do provide "explanations of what some fields do in Inteum . . . ."). Therefore, there is a genuine dispute as to whether Defendant's discussion with Wellspring regarding the Inteum front end constituted reverse engineering efforts that violated the License Agreement. Defendant's motion for summary judgment is DENIED on this ground.

### e. Use of Data Dictionary

Defendant moves for summary judgment on Plaintiff's assertion that Defendant's use of the data dictionary during the data migration breached the terms of the License Agreement and NDA. (Dkt. Nos. 45 at 16, 51-4 at 3.) Defendant's employee Daniel Leong stated that he "referred to the Inteum Data Dictionary to help [him] locate a certain data field and understand what was stored in that particular field" during the data migration process, which assisted in Defendant's extraction of its data from the Inteum Software. (Dkt. No. 48 at 5–6.) Leong further stated that he did not provide a copy of the data dictionary to Wellspring or facilitate Wellspring's access to the data dictionary at any time. (*Id*. at 6; *see also* Dkt. No. 62-1 at 160) (email from Leong stating that the data dictionary was only for Defendant's use).

During his deposition, Plaintiff's CEO stated that a licensee was not contractually prohibited from "refer[ring] to the data dictionary for purposes of data cleanup or data migration . . . ." (Dkt. No. 51-1 at 43–44.)[4] Plaintiff has not offered contravening evidence, or otherwise

---

[3] Plaintiff does not appear to argue that these discussions violated the confidentiality terms of the NDA. (*See* Dkt. No. 61 at 12, 14–16.)

[4] When further asked whether he could "identify where it would be written down that you cannot refer to the data dictionary for purposes of data cleanup or data migration," Plaintiff's CEO stated that any prohibition against such use was, "Not in a policy statement that is stored as such in the company. But does it exist in the pantheon of 25 years' worth of emails written to a

established that Defendant's reference to the data dictionary while extracting its data did not fall within Defendant's "full use and enjoyment of" the Inteum Software, even if such extraction was done with the goal of data migration. (*See* Dkt. No. 61 at 14–16.) Therefore, Defendant has established that there is no genuine dispute that Defendant's referral to the data dictionary during the data migration process did not breach the terms of the License Agreement or NDA, and Defendant's motion for summary judgment is GRANTED on this ground.[5]

### 3. Damages

#### a. *Damages Resulting from Disclosure*

Defendant moves for summary judgment on Plaintiff's claim for damages arising from its breach of contract claims. (Dkt. No. 45 at 15.) As discussed above, Plaintiff's breach of contract claims are premised on the same operative facts and theory of damages underlying its trade secret misappropriation claims: Plaintiff briefly contends that it is entitled "to damages relating to the disclosures in breach of the contract," and its monetary damages sought in this suit are "the total value of the trade secrets that [Defendant] provided to Wellspring." (*See supra* Section II.B.; Dkt. Nos. 51-4 at 15, 61 at 16.) As discussed below, Plaintiff has not adequately demonstrated that it is entitled to recover its claimed research and development costs from Defendant. (*See infra* Section II.E.3.).

---

former customer? It's likely." When further asked if such a policy "exist[ed] in a signed contract . . . with any licensee," Plaintiff's CEO responded, "No." (Dkt. No. 51-1 at 43–44.)

[5] The Court also notes that Plaintiff has argued that its breach of contract claims entitled it to "damages relating to the disclosures in breach of the contract . . . [and] damages for the loss of the contract." (Dkt. No. 51-4 at 16; *see also* Dkt. No. 51-4 at 15–16) (Plaintiff's claimed damages in this case premised on the value of the lost contract and "the total value of the trade secrets that NUS provided to Wellspring"). As the uncontroverted evidence in the record establishes that Defendant did not disclose the data dictionary to Wellspring (*see* Dkt. Nos. 48 at 5–6, 62-1 at 160), Plaintiff's claim for damages premised on this alleged breach would have to be based on the lost value of the contract. (Dkt. No. 51-4 at 15–16.) As discussed below, Plaintiff is not entitled to recover the value of the lost contract. *See Capitol Pros, Inc. v. Vadata Inc.*, 2018 WL 3390457, slip op. at 2 (W.D. Wash. 2018). Therefore, Plaintiff has also failed to establish a recoverable loss caused by Defendant's alleged improper use of the data dictionary.

### b. Loss of the Contract

Plaintiff asserts a damages theory based on the loss of the parties' contractual relationship. (Dkt. No. 61 at 16; *see also* Dkt. No. 51-4 at 15.) Plaintiff contends that Defendant would have had to continue the parties' contractual relationship because it could not transfer to Wellspring's Sophia product without breaching the License Agreement and NDA. (Dkt. No. 61 at 16.)

A plaintiff must "establish damages resulting from the breach with a reasonable degree of certainty." *Capitol Pros, Inc.*, 2018 WL 3390457, slip op. at 2 (citation omitted). Expectation damages are generally awarded for breach of contract, by which the injured party is awarded "a sum of money that will, to the extent possible, put the injured party in as good a position as that party would have been in had the contract been performed." *Mason v. Mortg. Am., Inc.*, 792 P.2d 142, 146 (Wash. 1990). If a party has materially performed under the contract, "there is no amount of damages required to 'put the injured party in as good a position as that party would have been in had the contract been performed.'" *Capitol Pros, Inc.*, 2018 WL 3390457, slip op. at 2 (quoting *Mason*, 792 P.2d at 146). Similarly, if the breaching party is under no obligation to renew a contract, the injured party cannot recover damages based on the breaching party's refusal to renew the parties' contractual relationship. *See id.*; s*ee also Evergreen Int'l Airlines, Inc. v. Boeing Co.*, C10-0568-JCC, Dkt. No. 22 at 5, 7–8 (W.D. Wash. 2010) (plaintiff could not recover on claim for loss of contract where defendant properly exercised its right not to renew).

It is undisputed that Plaintiff "received full payment of all license and software maintenance fees through the end of the license period." (Dkt. No. 47 at 6.) It is also undisputed that Defendant was not obligated to renew the parties' contractual relationship at the conclusion of the SMP on August 6, 2016. (Dkt. No. 51-1 at 7–8, 27–28.) Therefore, Plaintiff's claim for breach of contract damages premised on the loss of its contractual relationship with Defendant fails as a matter of law. *Capitol Pros, Inc.*, 2018 WL 3390457, slip op. at 2. The Court GRANTS summary judgment on Plaintiff's loss of contract theory of damages.

**E. Misappropriation of Trade Secrets**

1. Status of Information as Trade Secrets

Defendant asserts that three of Plaintiff's alleged trade secrets are not protected by the WUTSA. (Dkt. No. 45 at 18.)[6] "A plaintiff seeking to establish a trade secrets claim under [the WUTSA] has the burden of proving that legally protectable secrets exist." *Modumetal*, 425 P.3d at 878 (quoting *Boeing*, 738 P.2d at 674). Thus, a plaintiff must establish "(1) that the information derives independent economic value from not being generally known or readily ascertainable to others who can obtain economic value from knowledge of its use and (2) that reasonable efforts have been taken to maintain the secrecy of the information." *Id*. at 879 (quoting *Precision Moulding & Frame, Inc. v. Simpson Door Co.*, 888 P.2d 1239, 1242 (Wash. Ct. App. 1995)); Wash. Rev. Code § 19.108.010(4).

The plaintiff bears the burden of demonstrating that the alleged trade secrets are novel and unique, and that the plaintiff has taken efforts to maintain the secrecy of the information that are "reasonable under the circumstances." *Machen, Inc. v. Aircraft Design, Inc.*, 828 P.2d 73, 76–79 (Wash. Ct. App. 1992), *overruled on other grounds by Waterjet Tech., Inc. v. Flow Int'l Corp.*, 996 P.2d 598 (Wash. 2000). To be novel, "the information must not be readily ascertainable from another source." *Robbins, Geller, Rudman & Dowd, LLP v. State*, 328 P.3d 905, 911 (Wash. Ct. App. 2014) (quoting *Spokane Research & Def. Fund v. City of Spokane*, 983 P.2d 676, 682 (Wash. Ct. App. 1999). "A key factor in determining whether information has 'independent economic value' under the statute is the effort and expense that was expended in developing the information." *McCallum v. Allstate Prop. & Cas. Ins. Co.*, 204 P.3d 944, 951 (Wash. Ct. App. 2009)

"The alleged unique, innovative, or novel information must be described with specificity and, therefore, 'conclusory' declarations that fail to 'provide concrete examples' are insufficient

---

[6] Defendant does not move for summary judgment on whether a "full backup" of Plaintiff's database or the data dictionary qualify as trade secrets. (Dkt. No. 45 at 18.)

to support the existence of a trade secret." *Robbins*, 328 P.3d at 911 (quoting *McCallum*, 204 P.3d at 951); *see also Belo Mgmt. Servs., Inc. v. ClickA Network*, 343 P.3d 370, 375 (Wash. Ct. App. 2014); *Woo v. Fireman's Fund Ins. Co.*, 154 P.3d 236, 240 (Wash. Ct. App. 2007) (stating that conclusory declarations that failed to show how alleged trade secrets were materially different from methods of other competitors were insufficient to show existence of trade secrets)

Thus, Plaintiff bears the burden of establishing that each alleged trade secret is protected under the WUTSA through declarations or affidavits providing concrete examples as to how the alleged trade secrets are novel and unique and that they have been subject to reasonable efforts to maintain their secrecy. *Modumetal*, 425 P.3d at 878; *Robbins*, 328 P.3d at 911. Plaintiff relies on the declaration of Tim Hollobon to support its trade secret claims. (Dkt. No. 61 at 3, 17–20; *see generally* Dkt. No. 64.)[7] Each of Defendant's challenges to Plaintiff's trade secret claims will be examined in turn.

### a. Secondary Tables

Defendant contends that there is no genuine dispute on the issue of whether the .csv versions of the secondary tables are trade secrets. (Dkt. No. 45 at 18.) The secondary tables claimed as trade secrets by Plaintiff fall into three categories: the DD tables, the AICS tables, and the record access control ("RAC") tables. (Dkt. No. 46 at 12, 14, 17.)

The .csv versions of the DD tables sent from Defendant to Wellspring contained only column headers; they do not disclose accompanying data, code, or other contextualizing information. (Dkt. No. 46 at 12–13.) According to Defendant's manual for the Inteum Software, posted online, the DD tables are used by the data dictionary to temporarily hold data for print jobs. (Dkt. No. 46-8 at 113.) Hollobon does not opine as to whether reasonable efforts have been taken to maintain the secrecy of the DD tables, or if so how the DD tables derive economic value from being kept secret. (*See generally* Dkt. No. 64); *Modumetal*, 425 P.3d at 879; Wash. Rev.

---

[7] Plaintiff has stated that it "does not believe" that Hollobon's testimony falls within Federal Rule of Evidence 702. (Dkt. No. 70 at 44.)

Code § 19.108.010(4). Therefore, Plaintiff has not carried its burden of establishing that the DD tables are entitled to protection as trade secrets.

The AICS tables are used to integrate the Inteum Software's database with a separate product of Plaintiff, "Analytics for Inteum." (Dkt. No. 46 at 14–15.) The AICS tables are unique to the Analytics for Inteum product; a customer who is not using the Analytics for Inteum product would not use the AICS tables. (Dkt. No. 52 at 75.)[8] As with the DD tables, the .csv versions of the AICS tables sent from Defendant to Wellspring contained only column headers. (Dkt. No. 46 at 14.) Hollobon opines that the .csv versions of the AICS tables qualify as trade secrets because several of the column headers contain the acronym "SQL," and therefore a competitor could infer that Plaintiff stores SQL code in the AICS tables and gain a competitive advantage. (Dkt. No. 64 at 7–8.) But the technique of storing SQL code within a database is not unique to Plaintiff; it is a generally known technique in the industry. (*See* Dkt. No. 72 at 3, 11–13, 15–17) (Dr. Surati declaring that he has used this technique in designing databases in the past, and blog posts from 2010 and 2011 discussing the efficacy of storing SQL code statements in databases). Hollobon does not provide concrete examples demonstrating that Plaintiff's method of storing SQL code in the AICS tables is materially different from that which Dr. Surati describes. (*See* Dkt. No. 64 at 7–8.) Further, even assuming that Plaintiff's method is unique, Hollobon has not described how a competitor would derive information about Plaintiff's unique method from the .csv versions of the AICS tables, which only disclose that the AICS tables store SQL code within themselves. (*Id.*; *see* Dkt. No. 46 at 14.) Therefore, Plaintiff has not carried its burden of establishing that the AICS tables are entitled to protection as trade secrets.

The RAC tables "relate to regulating the level of access a group of users (security group) or certain users enjoys for a certain record. Called a user-based permissions system, it is

---

[8] Although the parties dispute whether Defendant possessed or used the Analytics for Inteum product, (*Compare* Dkt. Nos. 46 at 15, 72 at 2; *with* Dkt. No. 64 at 7), this is irrelevant for determining whether the AICS tables constitute trade secrets.

exceedingly common in database design." (Dkt. No. 46 at 18.) In order to improve the performance of its database, Plaintiff materialized data related to view, edit, and delete functions into three raw data tables to store record security settings. (Dkt. No. 64 at 5, 8–9; *see also* Dkt. Nos. 46 at 22–23, 72 at 4.) The technique of materializing data into smaller groups in order to improve database performance, including materializing data by creating a new data table, is not unique to Plaintiff. This technique is used in other databases, and is generally known in the industry. (Dkt. Nos. 46 at 23, 72 at 4; *see* Dkt. No. 46-2 at 78–93) (blog posts from 2012, 2013, and 2016 discussing the benefits of materializing data into tables instead of using materialized view); *see also* Dkt. No. 72 at 20) (Hollobon acknowledging in his deposition that using materialization to help speed up a database is not unique to Plaintiff). Plaintiff's claim that the RAC tables are entitled to protection as trade secrets appears to turn on Plaintiff's specific use of three raw data tables to store its record access control data. (*See* Dkt. No. 64 at 5–6, 8–9.)[9]

   Hollobon's declaration is too conclusory to prove that the .csv versions of the RAC tables are entitled to protection as trade secrets. Hollobon acknowledges that the practice of materializing data to increase the speed of a database is not unique to Plaintiff. (Dkt. No. 72 at 20.) Hollobon does not provide concrete examples of how Plaintiff's use of three tables in particular, using the well-known technique of breaking large amounts of data into smaller chunks using materialization (*see* Dkt. No. 72 at 4), is materially different from other applications of the technique in the industry. *Machen*, 828 P.2d at 76–79; *Woo*, 154 P.3d at 240. In fact, Hollobon has stated that he is unaware of how competitors' databases work and cannot say for certain that no other entity has arrived at using the exact same method. (Dkt. Nos. 52 at 109, 71 at 15–18.) Further, although Hollobon opines that Plaintiff's method enables the Inteum Software to be

---

[9] Hollobon's declaration does not readily disclose another basis for differentiating Plaintiff's method from those commonly used in the industry. (*See* Dkt. No. 64 at 5–6, 8–9.) Similarly, neither Plaintiff's brief argument on this issue in its response to Defendant's motion for summary judgment nor its supplemental answers to Defendant's interrogatories shed much light as to what in particular entitles the RAC tables to trade secret protection. (*See* Dkt. Nos. 51-4 at 11–13, 61 at 17.)

"optimal for SQL Server, Oracle and mySQL at the same time" and to perform "optimally in initial materialization and synchronizations when the database values change," he does not explain what makes Plaintiff's method optimal or materially different from others in the industry. (Dkt. No. 64 at 8–9.)

Hollobon also opines that knowing Plaintiff's method would confer a competitive advantage to others by improving database performance speed. (*See* Dkt. No. 63 at 5–6, 8–9.) But he appears to assume that any competitor provided with an opportunity to view Plaintiff's method would incorporate that same method, and thus improve the performance of its database. (*Id.*) Hollobon does so without providing supporting concrete examples or otherwise explaining what makes Plaintiff's method materially different and better than methods that its competitors may already be employing. *Robbins*, 328 P.3d at 911–12; *Woo*, 154 P.3d at 240.[10]

Finally, Hollobon has not demonstrated that Plaintiff's method of materializing record access data into separate tables has been subject to reasonable efforts to maintain its secrecy. *Modumetal*, 425 P.3d at 878; *Machen*, 828 P.2d at 76–79. Hollobon acknowledges that the names of several of the RAC tables have been disclosed in Plaintiff's publicly-available Database Change Log. (Dkt. No. 64 at 10.) For example, one such entry reads, "SU 5223 – Oracle – Record Level security tables do not materialize (e.g. VW_MKTTGT_SM, ED_MKTTGT_SM) inherited TECH and INVDISC security." (Dkt. No. 46-3 at 9.) Both of these named tables are RAC tables Plaintiff claims constitute trade secrets. (Dkt. No. 46 at 25.) Another entry reads, "SU 4568 – Rematerialize of Record Access security tables may freeze when DL_MKTTGT_SM, ED_MKTTGT_SM, or VW_MKTTGT_SM is being processed." (Dkt. No. 46-3 at 23.) These entries indicate that Plaintiff's database materializes record access control data, uses multiple tables, and separates data into three tables based on the delete

---

[10] Defendant asserts that Hollobon could not identify valuable information or a competitive advantage that a competitor would be able to derive from the .csv files, as he was unsure if a competitor could determine the function of one of the secondary tables upon examination. (Dkt. Nos. 69 at 10, 71 at 11–12.)

("DL_"), edit ("ED_"), and view ("VW_") rights pertinent to a specific underlying table (in the latter entry, "MKTTGT_SM").[11]

In addition, Plaintiff's trial version of the Inteum Software, which it provides to potential customers without an accompanying nondisclosure agreement, discloses via pop-up notifications that record access control settings are materialized into the database when a new record is created. (Dkt. Nos. 46 at 24; 51-9 at 111, 117.) Hollobon's declaration does not address the disclosures provided by Plaintiff's trial version. (*See generally* Dkt. No. 64.) This further demonstrates that Plaintiff has failed to establish how it has taken reasonable efforts to maintain the secrecy of the RAC tables. *Modumetal*, 425 P.3d at 878; *Machen*, 828 P.2d at 76.

In sum, Hollobon's declaration is insufficient to carry Plaintiff's burden of establishing that the .csv versions of the RAC tables constitute trade secrets under the WUTSA. As Plaintiff has not carried its burden of establishing that any of the .csv versions of the secondary tables are entitled to protection under the WUTSA, Defendant's motion for summary judgment is GRANTED on this ground.

#### b. Filename List

Defendant moves for summary judgment on Plaintiff's claim that the Filename List qualifies as a trade secret. (Dkt. No. 45 at 20.) "[R]elational databases use certain 'database objects' as building blocks to create a functional database." (Dkt. No. 46 at 26.) Six common database objects are tables, indexes, views, procedures, functions, and triggers. (*Id.*)[12] Two further objects, large objects ("LOB") and packages, are proprietary and unique to Oracle databases. (*Id.*) The Filename List is a 39-page document listing the names of the database

---

[11] Although Hollobon contends that the Database Change Log "only discloses the table names and not the fields within the tables," Dr. Surati points out that the tables' names are the only usable part of the .csv files transferred from Defendant to Wellspring; absent additional context, the integer values contained within the .csv versions of the RAC tables themselves do not convey useful information to the recipient. (Dkt. No. 64 at 10, *cf*. Dkt. No. 46 at 18.)

[12] Plaintiff has publicly disclosed that the Inteum Software uses the six commonly-used types of objects described above via the Database Change Log. (Dkt. No. 64 at 3–4.)

objects contained in Plaintiff's database at the time Defendant was migrating its data to Wellspring's KMS. (Dkt. Nos. 46 at 6, 64 at 3.) Defendant's employee Qui Ying sent the Filename List to Wellspring in April 2016, and asked Wellspring to identify which specific database objects it needed to export from the database during the migration. (Dkt. No. 49 at 2.) Plaintiff contends that the Filename List is a "full blueprint of [Plaintiff's] database."[13]

The Filename List provides the name of each database object and what type of object it is (*e.g.*, "table" or "view"). (Dkt. No. 46 at 28.) Dr. Surati opines that knowing this information alone does not provide much value to a recipient; for example, although one could infer the naming conventions used by Plaintiff, one would need additional information, such as code or additional metadata, to see how each database object functions or is used by Plaintiff. (*Id*. at 28–29.) Dr. Surati states that "[t]he value of such database objects is their purpose, or function, within the database. Without more information than is provided in [the Filename List], it is impossible for me to know how the Inteum Database used any one of these database objects." (*Id*. at 29–30.)

In response, Hollobon opines that the Filename List would be valuable to a competitor because it shows "a pattern in that [the database objects] are similarly named." (Dkt. No. 64 at 5.) He provides an example where two tables share a name, except the second indicates that a view table is used to materialize the data table. (*Id*. at 5–6.) After noting that Dr. Surati could not determine the difference in purpose between two similarly named tables, Hollobon asserts that "a competitor would want to know why this is, and would inevitably conclude that the use of

---

[13] Defendant asserts that Plaintiff waived its claim that the Filename List is a trade secret by providing it to Wellspring without confidentiality protection in response to a document subpoena. (Dkt. No. 45 at 21.) Plaintiff contends that it did not request confidentiality protection for the Filename List because Wellspring had possessed it for over two years, and refers to a joint defense agreement between Wellspring and Defendant, although Plaintiff does not elaborate as to the impact of any such agreement. (Dkt. No. 61 at 17–18.) As Plaintiff sent the Filename List "to determine what use Wellspring had made of the document," (*id*. at 17), in the context of discovery for litigation, the Court declines to find that Plaintiff waived its claim that the Filename List is a trade secret. *See Machen*, 828 P.2d at 78.

multiple tables is part of the reason the materialization of [Plaintiff] runs so fast." (*Id*. at 6.) He does not provide another basis for how knowing the names of each database object would confer an advantage to a competitor. (*See generally id*.)

Hollobon's declaration regarding the Filename List suffers from the same deficiency as his opinion regarding the secondary tables. Hollobon's statement that a competitor would "inevitably conclude" that Plaintiff uses multiple tables to achieve fast materialization does not quantify the advantage a competitor would gain from this knowledge. *See Robbins*, 328 P.3d at 911–12; *Woo*, 154 P.3d at 240. Further, as discussed above, Plaintiff has not established that its use of multiple tables to improve database performance qualifies as a trade secret. (*See supra* Section II.E.1.a.) Therefore, Plaintiff has not established that the names of the database objects contained in the Filename List are entitled to protection under the WUTSA.

The Filename List also provides the total number of database objects contained in Defendant's version of the Inteum Software's database, along with the number of each type of object. (Dkt. No. 52 at 24.) The number of database objects alone does not disclose how Plaintiff uses those database objects or how it integrates them. (Dkt. No. 46 at 31.) Also, this number is unique to Defendant's version of the Inteum Software's database, as users of the Inteum Software have the ability to create their own database objects, which are included in the total number of database objects. (*Id*. at 30.) Hollobon does not opine as to how a competitor would benefit from knowing the exact number of database objects Defendant's version of the Inteum Software; instead, he repeatedly states that the number of database objects in Plaintiff's database has not previously been publicly disclosed. (*Id*. at 4, 10.) Maintaining the secrecy of the alleged trade secret is only one of the prongs a plaintiff must satisfy. *See Modumetal*, 425 P.3d at 879.[14]

---

[14] Hollobon analogizes the Filename List to a race car, stating that, "it was not a manual for building a race car. But it listed every last part. In the hands of a competitor, it was an invaluable look under the hood of the competitor's car." (Dkt. No. 64 at 6.) During his deposition testimony, he stated that the Filename List was a "gold mine" that provided insight as to Plaintiff's focus within the product and intent to obtain processing speed, but acknowledged that a competitor would not be able to reverse engineer or recreate Plaintiff's database. (Dkt. No. 64

Therefore, Plaintiff has not carried its burden of establishing that the Filename List is entitled to protection as a trade secret under the WUTSA. Defendant's motion for summary judgment is GRANTED on this ground.

### c. *Inteum Front End*

Defendant moves for summary judgment on Plaintiff's claim that the Inteum front end is entitled to protection as a trade secret under the WUTSA. (Dkt. Nos. 45 at 21–22, 51-4 at 13.) Defendant contends that Plaintiff has failed to adequately specify the trade secret it claims Defendant misappropriated. (Dkt. No. 45 at 21–22.) Plaintiff does not argue that the Inteum front end constitutes a trade secret, but that Leong discussed the Inteum front end with a Wellspring employee in an effort to port over Inteum functionality into Wellspring's KMS. (Dkt. No. 61 at 12, 17–20.) Hollobon does not opine as to the status of the Inteum front end as a trade secret, and instead states that Defendant provided Wellspring with screenshots of the Inteum Software's output along with written explanations of how certain fields and tables work, which "was a plain violation of the license." (Dkt. No. 64 at 7.) In light of Plaintiff's non-opposition to Defendant's motion for summary judgment as to the status of the Inteum front end as a trade secret misappropriated by Defendant, Defendant's motion is GRANTED on this ground.

### 2. Misappropriation

Defendant moves for summary judgment on the issue of whether Plaintiff has established that Defendant misappropriated the alleged trade secrets at issue. (Dkt. No. 45 at 22–27.) Misappropriation of a trade secret includes:

> Disclosure or use of a trade secret of another without express or implied consent by a person who . . . [a]t the time of the disclosure or use, knew or had reason to know that his or her knowledge . . . was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

at 50–51.) He further stated that the Filename List did not disclose the purpose of each database object or how the objects interacted with one another, and that he was unsure how a competitor would directly benefit from inferring how certain database objects interacted. (Dkt. No. 52 at 76, 90–91, 96–97, 101–02, 105–06.)

Wash. Rev. Code § 19.108.010(2)(b)(ii). Other jurisdictions have held that a party's prior receipt of alleged trade secrets precludes a finding that the trade secrets were "disclosed." *See, e.g.*, *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 582–83 (5th Cir. 2015) (affirming trial court's finding that defendant did not disclose plans claimed as trade secrets when receiving party already possessed the plans in different format); *see also Veronica Foods Co. v. Ecklin*, 2017 WL 2806706, slip op. at 13 (N.D. Cal. 2017); *Thomas v. Starz Entm't LLC*, 2016 WL 5421992, slip op. at 6 (C.D. Cal. 2016) (both noting that "disclosure" requires that the relevant information was previously secret or unknown).

The Inteum Software "is cumulative. Each new version contains all the elements of the prior version, with additions and improvements." (Dkt. No. 51-4 at 16; *see also* Dkt. No. 64 at 2.) Defendant was "using a mid-2014 version of the [Inteum Software's] database . . . ." (Dkt. No. 46 at 30.) Prior to the data migration in April 2016, Wellspring's CEO Rob Lowe told Ying that, "Inteum is a Microsoft SQL backend, which we have converted many, many times. We also know the database mapping (ERD) well . . . We have the table diagrams and mapping of how Inteum's system works." (Dkt. No. 51-4 at 170.)[15] Lowe later testified that Wellspring had received backups of the Inteum Software's database in the past, including in .BAK file format that would allow Wellspring to restore the received database in its entirety. (*Id.* at 91; Dkt. No. 46 at 6–7.) In April 2016, Wellspring's Chief Operating Officer Matt Hamilton told Leong, "[Wellspring has] converted about 8 Inteum users in the past year, probably about 30 or more over the past few years . . . In the case of [University of New South Wales] we had received two database backups which we extracted into .csv files to transfer into the Sophia dataset." (*Id.* at 173.) He further stated that, "we have already received full database backups of Inteum numerous times from a variety of clients," and later testified that Wellspring "did not receive anything new from [Defendant] that we had not seen" (*Id.* at 173, 185–86.)

---

[15] Lowe later stated, contrary to his email, that Wellspring no longer had the ERD. (Dkt. No. 62-1 at 5–6.)

Defendant's unrebutted evidence establishes that Wellspring previously received copies of the full Inteum Software database, including .BAK files that could be used to restore the received databases, and did not learn anything new from the material sent by Defendant. (Dkt. No. 51-4 at 91, 170, 173, 185–86.) In response, Plaintiff cites deposition testimony of Hamilton in which he could not recall which of Wellspring's clients had sent full database backups in 2016 and stated that in all cases Wellspring had received "the client data . . . for the implementation." (Dkt. Nos. 16 at 13, 62-1 at 143–44.) But Plaintiff's challenge to Hamilton's credibility is insufficient to preclude summary judgment. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001). Further, Plaintiff has not rebutted Lowe's statements that Wellspring had previously received full backups of the Inteum Software's database, including in .BAK file formats. (*See* Dkt. No. 16 at 13.) Therefore, even if Plaintiff is able to establish at trial that Defendant provided Wellspring with a copy of the Inteum Software's database, it has not established that this constituted an actionable "disclosure" in violation of the WUTSA. Defendant's motion for summary judgment is GRANTED on this ground.[16]

### 3. Damages

Defendant moves for summary judgment on Plaintiff's claims for damages. (Dkt. No. 45 at 27–29.) Plaintiff seeks damages for "(1) the value of the lost contract with [Defendant]; and (2) the total value of the trade secrets that [Defendant] provided to Wellspring," calculated as $5,100,000. (Dkt. No. 51-4 at 15–16.)[17,18] In its second amended complaint, Plaintiff

---

[16] As discussed above, Plaintiff has not carried its burden of establishing that the secondary tables, Filename List, or the Inteum front end are trade secrets under the WUTSA. (*See supra* Sections II.E.1.a., II.E.1.b., II.E.1.c.) Therefore, the Court need not reach the issue of whether these were disclosed in violation of the WUTSA.

[17] As discussed above, Plaintiff cannot recover the value of the lost contract because Defendant was under no obligation to renew the SMP. (*See supra* Section II.D.3.b); (Dkt. No. 51-1 at 7–8, 27–28); *Capitol Pros, Inc.*, 2018 WL 3390457, slip op. at 2.

[18] In its response to Defendant's motion for summary judgment, Plaintiff appears to contend that its claimed damages may constitute a "reasonable royalty." (*See* Dkt. No. 61 at 18.) Plaintiff's second amended complaint does not discuss this theory of damages, (*see generally* Dkt. No. 35), and Plaintiff has not submitted evidence or expert testimony supporting any

characterizes this as an award of Defendant's unjust enrichment arising from its unlawful behavior. (Dkt. No. 35 at 18.) Defendant contends that Plaintiff cannot recover its claim for lost development costs under the WUTSA because Plaintiff has failed to demonstrate either actual loss or that Defendant was unjustly enriched as a result of the alleged misappropriation. (Dkt. No. 45 at 27–29.)

Under the WUTSA, a plaintiff may seek injunctive relief, "damages for the actual loss caused by misappropriation," and damages from any "unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss, and exemplary damages." Wash. Rev. Code § 19.108.030(1). The WUTSA does not define "actual loss." *See id*. Courts interpreting the term have stated that actual losses include damages for injury in fact, including lost profits and the value of lost business opportunities. *Eagle Grp., Inc. v. Pullen*, 58 P.3d 292, 299 (Wash. Ct. App. 2002) (examining cases.) The WUTSA also does not define "unjust enrichment." *See* Wash. Rev. Code § 19.108.030(1). "Unjust enrichment is the method of recovery for the value of the benefit retained absent any contractual relationship because of notions of fairness and justice require it." *Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008). Washington courts have noted that:

> Three elements must be established in order to sustain a claim based on unjust enrichment: A benefit conferred upon the defendant by the plaintiff; an appreciation or knowledge by the defendant of the benefit; and the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

*Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc.*, 810 P.2d 12, 18 (Wash. Ct. App. 1991). In the context of a claim for unjust enrichment under the WUTSA:

> The traditional form of restitutionary relief in an action for the appropriation of a trade secret is an accounting of the defendant's profits on sales attributable to the

argument that its claimed research and development costs constitute a reasonable royalty. *See Veritas Operating Corp. v. Microsoft Corp.*, 2008 WL 7404617, slip op. at 5 (W.D. Wash. 2008). Plaintiff may not rely on this novel characterization of its claimed damages at this late stage.

use of the trade secret.... The plaintiff has the burden of establishing the defendant's sales; the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to be deducted in determining net profits.

*Petters v. Williamson & Assocs., Inc.*, 210 P.3d 1048, 1054 (Wash. Ct. App. 2009) (alteration in original) (quoting Restatement (Third) of Unfair Competition § 45 cmt. f., at 516–17 (1995)).

Plaintiff does not appear to argue that its sought monetary damages constitute actual losses. (*See generally* Dkt. No. 35; *see also* Dkt. No. 51-4 at 15–16.) But to the extent that Plaintiff raises this argument, Plaintiff has failed to identify such actual losses resulting from the alleged misappropriation. Plaintiff's CEO testified to Plaintiff's strength in the KMS market, including winning the majority of new customers and holding more market share than all of its competitors combined. (*See* Dkt. No. 51-1 at 23–25, 49.) Further, Plaintiff's total income has steadily grown from 2012 to 2017. (Dkt. No. 53 at 53.) Plaintiff has not offered evidence showing that it has suffered any actual loss from the alleged misappropriations, such as lost profits or business opportunities. *Eagle Grp., Inc.*, 58 P.3d at 299. Thus, Plaintiff has not established actual losses resulting from Defendant's alleged unlawful conduct. Wash. Rev. Code § 19.108.030(1).

Plaintiff's claim for unjust enrichment damages from Defendant is also flawed. (Dkt. No. 35 at 18.) Under Washington law, the plaintiff bears the initial burden of establishing the defendant's profits, and then the defendant subsequently bears the burden of establishing which portion of those profits is not attributable to the trade secret and any expenses that should be deducted. *Petters*, 210 P.3d at 1054. But Plaintiff's claim for damages, although directed at Defendant, seeks its research and development costs incurred in developing the Inteum Software. (Dkt. No. 51-4 at 16.) Defendant does not market KMS software, nor does it have its own software or database that may have been improved by any misappropriation of Plaintiff's trade secrets. Rather, Plaintiff's request for damages based on its research and development costs is

more appropriately directed at Wellspring, as the would-be beneficiary of receiving the alleged trade secrets in this case. But Wellspring is not a party to this lawsuit. (Dkt. No. 35 at 3.)

Even if Wellspring were a party, Plaintiff has not offered sufficient evidence to support its requested damages. Plaintiff seeks its total research and development costs incurred in developing the Inteum Software. (*See* Dkt. Nos. 51-4 at 16, 64 at 2.) Notably absent is evidence as to the costs saved by Wellspring in furthering the development of its own product, or profits of Wellspring attributable to the alleged misappropriation of the trade secrets. *See Bailie Commc'ns, Ltd.*, 810 P.2d at 18; *Petters, Inc.*, 210 P.3d at 1054. Plaintiff has similarly failed to offer evidence establishing that the Inteum Software has lost value equal to its total research and development costs following Defendant's alleged misappropriations of its trade secrets. Further, although Plaintiff has repeatedly cited the competitive advantage gained by Wellspring upon receipt of Plaintiff's claimed trade secrets as the basis for its damages, (Dkt. No. 70 at 83, 89), Plaintiff has quantified this benefit nor rebutted the testimony from Wellspring's employees that Wellspring has not derived any benefit from the receipt of Plaintiff's alleged trade secrets from Defendant. (*See* Dkt. No. 51-4 at 94–95, 182–87.)

In sum, Plaintiff has not demonstrated that it is entitled to relief from Defendant under either of its claimed theories of damages for its misappropriation of trade secrets claims. As discussed above, Plaintiff's claim for damages for breaches of the License Agreement and NDA are premised on the same operative facts, and Plaintiff has not provided a separate theory of damages in support of its breach of contract claims. Defendant's arguments in support of its motion for summary judgment as to Plaintiff's damages claims focus on Plaintiff's inability to show actual loss or that Wellspring used the alleged trade secrets, rather than the infirmity of Plaintiff's unjust enrichment damages theory and supporting evidence. (*See* Dkt. No. 45 at 15, 27–29.)

"After giving notice and a reasonable time to respond, the court may . . . grant the motion on grounds not raised by a party." Fed. R. Civ. P. 56(f)(2). Plaintiff is ORDERED to show cause

as to why this case should not be dismissed in its entirety for a lack of recoverable damages. Plaintiff shall submit briefing not to exceed five (5) pages on this issue no later than seven (7) days from the issuance of this order. Plaintiff shall identify what theory of damages and evidence supports its remaining breach of contract claims.

## III.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No. 45) is GRANTED in part and DENIED in part. Defendant's motion for summary judgment is GRANTED on Plaintiff's claims for: (1) breach of contract premised on disclosure of the secondary tables; (2) breach of contract premised on disclosure of the Filename List; (3) breach of contract premised on Defendant's use of the data dictionary; (4) trade secret misappropriation premised on disclosure of the secondary tables; (5) trade secret misappropriation premised on disclosure of the Filename List; (6) trade secret misappropriation premised on the Inteum front end; and (7) trade secret misappropriation premised on disclosure of the backup Inteum database. Defendant's motion for summary judgment is also GRANTED on Plaintiff's theories of damages premised on loss of the contract and Plaintiff's total research and development costs incurred in developing the Inteum Software.

Defendant's motion for summary judgment is DENIED on Plaintiff's claims for: (1) breach of contract premised on disclosure of the backup Inteum database; and (2) breach of contract premised on Defendant's discussion of the Inteum front end.

Plaintiff shall file briefing in accordance with this order no later than seven (7) days after the day this order is issued. Plaintiff shall identify what theory of damages and evidence supports its remaining breach of contract claims.

//

//

//

//

DATED this 5th day of March 2019.

John C. Coughenour
UNITED STATES DISTRICT JUDGE